2001 ME 17

**James G. BERNIER**

v.

**MERRILL AIR ENGINEERS**

**Docket No. Cum–00–32.**

Supreme Judicial Court of Maine.

Argued: Sept. 6, 2000.
Decided: Jan. 24, 2001.

Thomas B. Federle, Esq., (orally), Dyer, Goodall and Federle, LLC, Augusta, for plaintiff.

E. James Hamilton, Esq., (orally), Portland, for defendant.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

DANA, J.

[¶ 1] James G. Bernier appeals and Merrill Air Engineers cross appeals from a judgment entered in the Superior Court (Cumberland County, *Crowley, J.*), following a jury-waived trial. Bernier contends that the Superior Court exceeded the bounds of its discretion by amending the pleadings *sua sponte* and erred in concluding that he breached the nondisclosure paragraph in his employment contract. Merrill cross appeals from the judgment awarding Bernier attorney fees and trebled unpaid commissions pursuant to 26 M.R.S.A. § 626 (Supp.2000) and from the court's finding that Bernier did not use or disclose Merrill's trade secrets in violation of the Uniform Trade Secrets Act (UTSA), 10 M.R.S.A. §§ 1541–1548 (1997). We affirm the judgment.

## I. UNPAID COMMISSIONS

[¶ 2] Bernier worked as an engineer for Merrill from 1988 through March of 1997. In 1993, Merrill's president signed a memorandum promising engineers a three percent commission.[1] In 1996, after disputing the method of calculating the commission, Bernier received a letter from Merrill's accountant that stated: "As in the past these commissions will be paid if the cash is available at the time and the engineer is with the company at the time the job closes out (all customer payments received)."

[¶ 3] From the time the commission program was created until Bernier left the company, Bernier received commissions periodically but not necessarily at the end of each project. While still employed at Merrill, Bernier qualified for but had not received three commissions. As he was leaving, Bernier made a written request for payment. In response, Bernier received a note from the president that the commissions would only be paid after assessing Merrill's cash flow. Bernier demanded his commissions to no avail in two subsequent letters.

[¶ 4] Bernier filed suit against Merrill to recover, *inter alia*, unpaid commissions. Following a bench trial, the court found that Merrill was liable for past commissions. Pursuant to 26 M.R.S.A. 626,[2] the

---

1. The commission agreement stated in pertinent part:
   The following negotiations apply to this program and there may be more announced later.
   The salesman on the project and the co-sign engineer on the project will both receive 3% of gross profit at the close of the project. (Money received by us.) The only qualification is you sign the proposal and be here when the final invoice payment is made by the customer.
   It goes without saying that back charges to the job, after it is closed out, will have an adjustment on the project and this adjustment will affect the corrected bonus.

2. 26 M.R.S.A. § 626 provides in relevant part:

An employee leaving employment must be paid in full within a reasonable time after demand at the office of the employer where payrolls are kept and wages are paid
. . . .

. . . .
For purposes of this subchapter, a reasonable time means the earlier of either the next day on which employees would regularly be paid or a day not more than 2 weeks after the day on which the demand is made.
. . . .
. . . An employer found in violation of this section is liable for the amount of unpaid wages and, in addition, the judgment rendered in favor of the employee or employees must include a reasonable rate of inter-

unpaid commissions were trebled and attorney fees were granted for that portion of the award.

[¶ 5] Merrill's cross-appeal contends that the court erred in granting Bernier the commissions because the commissions were contingent on the availability of cash. Because the commission agreement indicates that other conditions may be "announced later," Merrill contends that the subsequent correspondence mentioning cash availability and the practice of distributing lump sum commissions at various times, not necessarily after a project closed, supplemented the original commission agreement. Furthermore, Merrill contends that because the commissions were not due until cash was available, the conditions in the commission agreement had not been satisfied, and as a result, section 626 is not applicable.

[¶ 6] Bernier contends that the requirements for the commission to vest were that (1) he sign the proposal and (2) he be at Merrill when the final invoice is paid by the customer. The court implicitly agreed with Bernier's reading of the memo and stated: "The suggestion that the payment of commissions was permanently contingent upon the availability of cash is rejected as just an unreasonable reading of the memo that created the entitlement to commissions." In addition, the court stated that the payment of the commissions was not contingent on the availability of cash because "[i]t is clear to me from the evidence presented that the financial affairs of Merrill Air Engineers were throughout the period of time in question in disarray ... and [the commissions] must at some point either at a reasonable time or when they became due under the Wage Statute have become due and payable ...."

[¶ 7] "We review issues of law *de novo* and issues of fact for clear error." *Spottiswoode v. Levine*, 1999 ME 79, ¶ 16, 730 A.2d 166, 172 (citations omitted). "[A] factual finding will be set aside as clearly erroneous only if there is no competent evidence in the record to support it." *Purdy v. Community Telecomm. Corp.*, 663 A.2d 25, 29 (Me.1995) (citation omitted).

[¶ 8] The commission agreement itself is devoid of language that indicates that availability of cash is a prerequisite to receiving the commissions. Bernier testified that he did not believe that his commission was contingent on cash availability. In addition, the court's conclusion that cash flow was a continuous problem and could not have been a qualification for receiving the commissions was supported by the president's testimony. Thus, the court's determination that the commissions were not contingent on the availability of cash is not clearly erroneous.

[¶ 9] After finding that the commissions were not contingent on the availability of cash, the court applied section 626. "The employment agreement, not section 626, governs how wages are earned and, if specified, when wages are to be paid." *Burke v. Port Resort Realty Corp.*, 1998 ME 193, ¶ 5, 714 A.2d 837, 839 (citation omitted). Because the court did not find that the availability of cash was a contingency that could be read into the agreement, the court concluded that pursuant to the agreement the commissions were due. The court did not err in concluding that the unpaid commissions should be trebled and attorney fees awarded to Bernier.

## II. BREACH OF CONTRACT

[¶ 10] When Bernier accepted employment at Merrill after receiving his engi-

est, an additional amount equal to twice the amount of those wages as liquidated dam-

ages and costs of suit, including a reasonable attorney's fee.

neering degree, he signed an employment contract that states in pertinent part:

### 3. *NON–DISCLOSURE*

*Confidential Material*

... [T]he Employee agrees that he or she shall not, during the term of employment by Tristar [holding company of Merrill] or at any time thereafter, divulge, use, furnish, disclose or make accessible to anyone other than Tristar or other than in Tristar's usual course of business, any knowledge or information with respect to (i) confidential or secret processes, plans, formulae, programs, devices or material relating to the business, services or activities of Tristar, (ii) any confidential or secret development or other original work of Tristar, (iii) any other confidential or secret aspect of the business, products, or activities of Tristar .... All records, materials, and information obtained by the Employee in the course of his or her employment are confidential and shall remain the exclusive property of Tristar.

[¶ 11] After having worked for Merrill for eight years, Bernier resigned in March of 1997 and accepted a job at Henry Molded Products, Inc. The Superior Court made the following findings of facts regarding the occurrences that preceded Bernier's resignation:

Merrill began working with the Henry Company which is located in Lancaster, Pennsylvania ... in 1995 when Merrill through Donald Currie [sic] [president of Merrill] began a course of dealings toward identifying how Henry Molded Products, which manufactured molding paper products, could benefit from a product dryer that would be designed and produced by Merrill to improve Henry's drying process. To this end Merrill invested time and money and resources in developing the business opportunity with Henry. Merrill's efforts included arranging for and conducting tests at the University of Maine at Orono, to collect data on drying Henry's product, investing in trips by Donald Currie [sic], ... to Henry's facility in Pennsylvania, to assess the Henry operation and dryer needs and current capacity, by developing specifications for a dryer that was suited to the Henry drying process and as a result of this process Merrill with Mr. Bernier at the helm developed a cost proposal for Henry in the latter part of 1996. Mr. Bernier's role and function in the preparation of the proposal was as manager of contract engineering, concept design, proposal preparation and budget preparation and he was in charge of detailed design and drafting for the proposal. On January 24th of 1997 Merrill submitted the proposal to Henry Molded Products. That proposal expressly says in a caption on a page on which nothing else appears that this is a confidential document, that the engineering design information contained herein is considered proprietary.

[¶ 12] Though the testimony is disputed, the court found that after Henry made a preliminary commitment to purchase a Merrill dryer design, Bernier contacted Henry for a job, Bernier resigned from Merrill, Henry canceled the dryer order, and Bernier accepted a position at Henry. The court further found that when Bernier inquired about employment at Henry, he was informed that Henry's objectives included obtaining dryers at the lowest price. When Bernier interviewed with Henry, he told a Henry employee that he had his own dryer design. The offer of employment that Bernier accepted included bonuses for dryers built while he was at Henry. By the end of 1997, a new dryer was built at Henry under Bernier's supervision. The dryer built at Henry varied

from the Merrill dryer design, although the parties dispute the degree of variation.

[¶ 13] Following Bernier's claim for unpaid commission, Merrill counterclaimed alleging, *inter alia,* his breach of contract and misappropriation of trade secrets. The court held that Bernier did not violate the UTSA, but did breach his "contractual obligations under both paragraphs three and four of his contract." Finding that it was more likely than not that Henry would have ordered a dryer from Merrill if Bernier had not breached his employment contract, Merrill was awarded damages in the amount of Merrill's net profit from the construction and design of the dryer for Henry.

[¶ 14] Bernier contends that the Superior Court erred in enforcing paragraph 3 (nondisclosure clause). First, Bernier contends that the nondisclosure clause is insufficient to protect information that is not protected by the UTSA. Second, Bernier contends that the nondisclosure clause is not reasonable.

[¶ 15] "[A]n employer, under a proper restrictive agreement, can prevent a former employee from using his trade or business secrets, and other confidential knowledge gained in the course of the employment, and from enticing away old customers . . . ." *Roy v. Bolduc,* 140 Me. 103, 107, 34 A.2d 479, 480–81 (1943) (construing a noncompete agreement). The confidential knowledge or information protected by a restrictive covenant need not be limited to information that is protected as a trade secret by the UTSA. We have not previously read such limitations into restrictive covenants and do not do so now. *See id.; Ingersoll–Rand Co. v. Ciavatta,* 110 N.J. 609, 542 A.2d 879, 894 (1988) (construing a holdover agreement and recognizing that "employers may have legitimate interests in protecting information that is not a trade secret or proprietary information, but highly specialized, current information not generally known in the industry, created and stimulated by the research environment furnished by the employer, to which the employee has been 'exposed' and 'enriched' solely due to his employment").

[¶ 16] To be enforceable, however, restrictive covenants must be reasonable. The reasonableness of a restrictive covenant is a question of law. *See Brignull v. Albert,* 666 A.2d 82, 84 (Me.1995) (construing a noncompete agreement). Questions of law are reviewed *de novo. Spottiswoode,* 1999 ME 79, ¶ 16, 730 A.2d at 172.

[¶ 17] Proper restrictive covenants cannot preclude former employees from "following any trade or calling for which he is fitted and from which he may earn his livelihood" or "exercising the skill and general knowledge he has acquired or increased through experience or even instructions while in the employment." *Roy,* 140 Me. at 107, 34 A.2d at 481. To be enforceable the "agreement must impose no undue hardship upon the employee and be no wider in its scope than is reasonably necessary for the protection of the business of the employer." *Id.* at 107, 34 A.2d at 480.

[¶ 18] The nondisclosure clause in the Bernier–Merrill employment contract is reasonable. We uphold the court's conclusion that paragraph 3 reasonably prohibits Bernier from using particularized, highly specialized proprietary protected original work that was custom designed for a particular prospect. In balancing Bernier's interest in securing employment and Merrill's interest in protecting the confidential information it created, we find that the agreement does not pose an undue hardship on Bernier, and it is not broader than necessary to protect Merrill's busi-

ness. The nondisclosure clause does not prohibit Bernier from using the general skill and knowledge he acquired during his employment with Merrill. Instead, the nondisclosure clause protects the use of information that does not rise to the level of a trade secret but is more than general skill or knowledge. Thus, Paragraph 3 reasonably precluded Bernier from designing a dryer for Henry by using the "original work" he became privy to while developing Merrill's dryer proposal to Henry. In addition, we do not agree with Bernier's contention that the nondisclosure clause is unreasonable because it is not limited in duration. We do not find that durational limits are necessary in nondisclosure clauses, as they are in noncompete agreements, because the "imposition of geographic or durational limitations 'would defeat the entire purpose of restricting disclosure, since confidentiality knows no temporal or geographical boundaries.'" *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 761 (Iowa 1999) (citing 2 RUDOLF CALLMANN, THE LAW OF UNFAIR COMPETITION, TRADEMARKS & MONOPOLIES § 14.04, at 222–23 (Supp.1998)).

[¶ 19] Next, we consider Bernier's contention that, even if the nondisclosure clause is enforceable, there is insufficient evidence to conclude that while employed at Henry, Bernier used or disclosed in the words of the Superior Court "particularized, highly specialized proprietary protected original work that was custom designed" for Henry by Merrill. Bernier contends that the components of Merrill's original work, including graph oil seals, staggered mirror image nozzles, welded wall panels, end enclosures and burners that were identified during the trial as being used by Bernier to develop the Henry dryer, are not "particularized, highly specialized proprietary protected original work." The Superior Court stated:

[A]lthough there are differences between the original Merrill design and the ultimate dryer that was installed at Henry Molded Products, the timing of the negotiation and the hiring of Mr. Bernier and the timing of the Bernier design combined with the similarity of the Bernier design to the Merrill proposal led me to the inescapable conclusion that original work of Merrill was used.

Thus, the Superior Court made its determination based on a finding that the "original work" used by Bernier was the process and concept Merrill generated to create the Henry proposal, and not the separate components themselves.

[¶ 20] We review the sufficiency of evidence by considering whether, "by any reasonable view of the evidence, including inferences to be drawn therefrom, taken in the light most favorable to the prevailing party, the verdict can be sustained." *Withers v. Hackett*, 1998 ME 164, ¶ 7, 714 A.2d 798, 800 (citation omitted). We find that there is sufficient evidence that Bernier violated the nondisclosure clause by using "particularized, highly specialized proprietary protected original work" from Merrill. Whether Merrill's "original work" was used by Bernier to design the Henry dryer encompasses more than a component by component comparison. Bernier testified that while he was employed at Merrill, he assisted in preparing the Henry dryer proposal. The president of Merrill testified that the proposal contained the dryer description, including graph oil seals, tongue and groove walls, and the nozzle arrangement, and Bernier testified that the dryer he ultimately designed for Henry contained graph oil seals and mirror imaging nozzles. Bernier also testified that he was involved in observing and compiling the data that Merrill generated to create the Henry proposal. Fur-

thermore, Bernier testified that he wrote an interoffice memorandum at the end of his first week at Henry that stated: "[t]he knowledge gained this week in conjunction with my previous knowledge of the project will allow me to move ahead with the dryer design next week." Thus, the combination of the common components, the specific knowledge gained while developing the Henry dryer proposal while employed at Merrill, and the process of designing the dryer for Henry are sufficient facts to find that Bernier breached his employment contract.

[¶ 21] Finally, Bernier contends the court's findings that he breached both the nondisclosure (paragraph three) and non-compete (paragraph four) paragraphs of the employment contract were erroneous because Merrill failed to allege a violation of paragraph four. If paragraph 4 is an improper basis for a judgment, Bernier contends that the breach of contract claim cannot be upheld solely on the basis of paragraph 3 and should be vacated.

■■■ [¶ 22] "Whether to grant a motion to amend is left to the discretion of the trial court." *Mutual Fire Ins. Co. v. Richardson,* 640 A.2d 205, 207 (Me.1994) (citations omitted). In the instant case neither party made a motion to amend the pleadings, instead, the Superior Court determined *sua sponte* after the trial that paragraph 4 was tried by implied consent pursuant to M.R. Civ. P. 15(b).[3] "To avoid the possibility of prejudice to a party that may have relied upon the issues as delin-

eated in the pleadings or pre-trial order, we will deem an issue to have been tried by consent only where it clearly appears from the record that both parties consented to trial of the issue." *Steinberg v. Elbthal,* 463 A.2d 731, 734 (Me.1983) (citations omitted).

[¶ 23] Merrill did not plead a breach of paragraph 4 of the employment contract in either the counterclaim or the report of conference of counsel,[4] nor did it seek to amend the pleadings to include paragraph 4. The trial transcripts do not indicate that paragraph 4 was a focus of litigation or questioning by either party or the court.

■■■ [¶ 24] Much of the evidence presented at trial to prove a breach of paragraph 3 could have also been used to prove a breach of paragraph 4; however, we have stated that "[t]he mere fact that evidence presented at trial which is competent and relevant to the issues raised by the pleadings may incidentally tend to prove another fact not put in issue does not give rise to the application of Rule 15(b) and support a claim that the issue was tried by consent ...." *Blue Spruce Co. v. Parent,* 365 A.2d 797, 802 (Me.1976) (citations omitted). Thus, the Superior Court improperly amended the pleadings to include a violation of paragraph 4. The error, however, was harmless because the court's finding of a breach of paragraph 3 is adequate to affirm that Bernier breached his employment contract.

---

3. M.R. Civ. P. 15(b) states in pertinent part: **Amendments to Conform to the Evidence.** When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any

time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

4. Arguably, the report of conference of counsel that listed "misappropriation of corporate opportunity" as an issue might have alerted counsel to a claim that paragraph 4 was in issue.

## III. TRADE SECRETS

[¶ 25] In *Spottiswoode*, 1999 ME 79, 730 A.2d 166, we established that "a court examining a claim under the UTSA must determine whether the information at issue constitutes a 'trade secret,' as that term is defined in 10 M.R.S.A. § 1542(4)."[5] *Id.* ¶ 27, 730 A.2d at 174 (citation omitted). For information to qualify as a trade secret, the information must (1) derive "independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons"; and (2) be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 10 M.R.S.A. § 1542(4); *Spottiswoode*, 1999 ME 79, ¶ 27, 730 A.2d at 174–75.

[¶ 26] To determine whether the information derived "independent economic value," the Superior Court applied the five factors we articulated in *Spottiswoode*, and concluded that "Merrill has not convinced me that in the situation here, the information constituted a trade secret."[6] Merrill contends that the court misapplied the factors and as a result, incorrectly found that Bernier did not violate the UTSA, 10 M.R.S.A. §§ 1541–48.

5. 10 M.R.S.A. § 1542 provides in pertinent part:

§ 1542. **Definitions.**

As used in this Act, unless the context otherwise indicates, the following terms have the following meanings.

**1. Improper means.** "Improper means" means theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy or espionage through electronic or other means.

**2. Misappropriation.** "Misappropriation" means:

A. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

B. Disclosure or use of a trade secret of another without express or implied consent by a person who:

(1) Used improper means to acquire knowledge of the trade secret;

(2) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

(i) Derived from or through a person who had utilized improper means to acquire it;

(ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit is use; or

(3) Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

. . . .

**4. Trade Secret.** "Trade secret" means information, including, but not limited to, a formula, pattern, compilation, program, device, method, technique or process, that:

A. Derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

B. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

6. The five factors are:

(1) the value of the information to the plaintiff and to its competitors; (2) the amount of effort or money the plaintiff expended in developing the information; (3) the extent of measures the plaintiff took to guard the secrecy of the information; (4) the ease or difficulty with which others could properly acquire or duplicate the information; and (5) the degree to which third parties have placed the information in the public domain or rendered the information "readily ascertainable" through patent applications or unrestricted product marketing.

*Spottiswoode*, 1999 ME 79, ¶ 27, 730 A.2d at 174 n. 6 (citations omitted).

The court found factors 1, 2, 4 and 5 favor Bernier and factor 3 favors Merrill.

[¶ 27] We review issues of law *de novo* and issues of fact for clear error. *Spottiswoode*, 1999 ME 79, ¶ 16, 730 A.2d at 172. "[T]he definition of a trade secret is a matter of law," while "the determination in a given case whether specific information is a trade secret is a factual question." *Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wash.2d 427, 971 P.2d 936, 941 (1999) (citations omitted).

[¶ 28] The first factor is the value of the information to Merrill and to Merrill's competitors. Regarding the value of the information, the Superior Court found:

> [I]t's clear in the design of dryers ... that the Merrill design differs in some respects from other design[s] but ... the evidence in this case does not establish to my satisfaction that the Merrill design is inherently superior to those competitors ...; therefore, the evidence presented as to the value of the information in terms of the uniqueness of the Merrill design is not strong.

Merrill contends that the court's evaluation of the first factor in terms of the uniqueness and superiority of the dryer design was erroneous. We do not find this determination to be clearly erroneous. *Compare* RESTATEMENT OF TORTS § 757 cmt. b (1939) (stating that "[n]ovelty and invention are not requisite for a trade secret as they are for patentability") (section 757 was not included in the RESTATEMENT (SECOND) OF TORTS because the law of Unfair Competition & Trade Regulation is no longer dependent on tort law, as it once was) *with Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974) (concluding that some novelty is required "if merely because that which does not possess novelty is usually known; secrecy, in the context of trade secrets, thus implies at least minimal novelty") (footnote omitted) *and Murray v.*

*Bank One*, 99 Ohio App.3d 89, 649 N.E.2d 1307, 1313 (1994) (stating that "[t]o amount to a trade secret, the use of an item must be unique and competitively advantageous"). In addition, we do not find that the court erred in analyzing the value of Merrill information in terms of its utility as opposed to the actual economic value of the information. *See Picker Int'l Corp. v. Imaging Equip. Servs., Inc.*, 931 F.Supp. 18, 35 (D.Mass.1995) (finding the diagnostic software the plaintiff claimed was being misappropriated as a trade secret had "great competitive value" because it was "vital" to their business of repairing certain machines).

[¶ 29] The second factor is "the amount of effort or money the plaintiff expended in developing the information." The Superior Court found:

> [T]here was some effort, although no evidence as to the amount of money, there was some collaboration of the University of Maine and some travel there and the actual testing of some samples, although there was some evidence that the test results wouldn't mean an awful lot as applied to the Henry business. But although there was some effort there, the amount of money or effort is not well-defined and, therefore, the evidence on that point is not particularly strong.

In assessing the second factor, the court alters its focus from Merrill's general dryer design to the dryer specifically designed for Henry. Merrill does not challenge the court's approach; therefore, we need not consider whether the shifting focus of the court's approach was appropriate. *See Larrabee v. Town of Knox*, 2000 ME 15, 744 A.2d 544, 544 n. 1. Indeed, Merrill only contests the factual findings relating to this factor. The record supports the court's conclusion that the amount of money and effort expended to

develop the Henry proposal was not well defined.

[¶ 30] The court found that the third factor, "the extent of measures the plaintiff took to guard the secrecy of the information," supported a finding of trade secret status.

[¶ 31] The fourth factor examines "the ease or difficulty with which others could properly acquire or duplicate the information." Regarding this factor, the Superior Court concluded:

> [O]nce a Merrill dryer is on the scene, it doesn't take a great deal of effort or involve a lot of difficulty to find out what the nozzle pattern is, to find out whether it's a solid wall or a paneled wall and to find that it is vented at some point other than in the middle of the dryer. So the ease or difficulty with which others could properly acquire or duplicate the information would suggest as to that factor that this is not a protectable trade secret.

Merrill contends that Bernier could not "properly" reverse engineer the dryer design because the dryer was not acquired through proper and legal means. Merrill contends that Bernier obtained the information by breaching the nondisclosure clause of his contract and that Merrill customers sign confidentiality agreements; therefore, a Merrill dryer could not be properly reverse engineered. In the comments to the Uniform Trade Secrets Act, the National Conference of Commissioners on Uniform State Laws states that reverse engineering is a "proper" means to discover information. UNIF. TRADE SECRETS ACT § 1 cmt., 14 U.L.A. 438 (1990). The comment further states, however, that for reverse engineering to be proper, "[t]he acquisition of the known product must, of course, also be by a fair and honest means, such as purchase of the item on the open market . . . ." *Id.* It appears that the court

may have misperceived the importance of having acquired the design by "proper" means.

[¶ 32] The fifth factor considers "the degree to which third parties have placed the information in the public domain or rendered the information 'readily ascertainable' through patent applications or unrestricted product marketing." Merrill contends that the Superior Court erroneously concluded that:

> both from the patent application with respect to the thermodyne dryer of Merrill and with respect to the sale of other products, I think that the technology that Merrill suggests is unique and superior is readily ascertainable.

Merrill contends that the trade secret regarding the seals was not the physical seal but the actual information that Merrill had acquired that the seal "was a cost effective, suitable seal that gave Merrill a competitive advantage . . . ." The comments to the Uniform Trade Secret Act state that the readily ascertainable factor "does not require that information be generally known to the public for trade secret rights to be lost." UNIF. TRADE SECRETS ACT § 1 cmt., 14 U.L.A. at 439. "If the principal persons who can obtain economic benefit from information are aware of it, there is no trade secret." *Id.* There is evidence in the record that indicates that even though the seals were not advertised, they could be purchased from a supplier off-the-shelf, and anybody who knew about them could acquire them. Thus, implicit in the Superior Court's opinion is the fact that the seal and its superior qualities are readily ascertainable because the seals are sold by a third party and are "off-the-shelf" items. We do not find this finding to be clearly erroneous.

[¶ 33] After balancing the five *Spottiswoode* factors, the court found that the information Bernier used to design a dryer

for Henry was not a trade secret. Although the court's handling of the fourth *Spottiswoode* factor may have been error, its ultimate finding was not clearly erroneous.

The entry is:

Judgment affirmed.