STATE OF MAINE

KENNEBEC, ss.

SEVENTH DISTRICT COURT
DIV. OF SO. KENNEBEC
CIVIL ACTION
DOCKET NO. AUG-CV-03-137

LINDA J. VOSS,

       Plaintiff

       v.

**DECISION AND ORDER**

WOODMASTER OF MAINE, INC.,

       Defendant

This matter is before the court after bench trial. The amended complaint alleges an agreement for defendant to install a metal roof on plaintiff's home, that certain representations were made to plaintiff prior to entering into the agreement, that work was performed that resulted in an entirely unsatisfactory product, and that plaintiff paid the defendant a sum of money but she will have future expenses as a result of defendant's conduct. She seeks damages for breach of contract, fraud, unfair trade practice, breach of express warranty and breach of implied warranties.

The plaintiff is the owner of a home at 25 Highland Avenue in Waterville. Having suffered ice damage to her roof in November of 2001, she and her companion discussed with representatives of the defendant the installation of a new metal roof. After a conversation of some two and a half to three hours, plaintiff entered into a written contract with the defendant on the evening of November 27th. The contract executed by the parties called for the defendant to install steel roofing, forest green in color, and perform the following the work:

- Inspect roof and renail as needed.
- Strap roof with 1 x 3 strapping.
- Provide and install Bi-ribbed steel roofing to all sections of roof.
- Includes all accessories, vented ridge cap L-bend closure strips.

- 25 year warranty on steel roofing.
- Includes all labor, materials taxes and permits.
- Any additional work requires additional work order.

Consideration for the performance was to be $7,650 with bank financing to be arranged.

The preprinted contract carries a "Buyer's Right To Cancel." This gave a right to the plaintiff to cancel the contract provided the notice was mailed to the defendant before midnight of December 14, 2001, and the address for that purpose of the defendant was listed.

A change order was executed December 28, 2001, as follows:

Terms of original contract are changed to cash with 20% down payment $1,530 due on check out and balance of $6,120 due on completion.

During the discussions with the representatives of the defendant leading up to the contract, the plaintiff understood from representations made that the roof would be completed and fit to a tolerance of 1/16" and that all cut edges of the material would be "factory sealed." Plaintiff indicates that defendant's representatives told her that "no other company could do this." Finally, the terms as proposed by the defendant were described as a "one day deal" and required the plaintiff to enter the contract, if at all, on the very evening it was discussed.

On February 4, 2002, the material was delivered and placed on the grounds of plaintiff's home and the work on the roof started on February 5, 2002. The roof job was completed on February 13.

Phil Crandlemire, friend and housemate of plaintiff, videotaped the material as it was positioned on the ground of the home and inspected it. He noted a tag on the material that suggested that the material should not be stored on the ground. He noted scratches on the top of sheets and wood on top of the metal sheets. Because of this, he called the general manager of the defendant corporation and complained. As the

workers were making the installation, Mr. Crandlemire also videotaped the entire process.[1]

As the work was being completed, plaintiff noticed that damage had been done to her property including damage to a door handle, screens, etc. and cigarette butts in the area. She also noticed gaps in the fit of the roof. At the time of completion, a member of the installation crew advised plaintiff that they expected to receive timely payment. Phil Trask, expediting manager of the defendant, inspected the job on February 14 when Mr. Crandlemire made the complaints regarding the job. On that same date, Mr. Trask prepared an "additional work authorization" for work to be done without charge to the plaintiff.

> Woodmaster agrees to screw down metal where necessary. File down cut edge where possible. Repair one screen, replace mailbox, paint scratches on metal in warm weather. Flash around chimney with metal.

The repairs were completed with respect to the plaintiff's house but it was agreed that further work on the roof would wait until warmer weather in the Spring. In the meantime, defendant's representative asked for payment in the amount of $4,500 toward the contract price. It was reported to plaintiff and Mr. Crandlemire that an employee of defendant who had worked on the job was getting married and defendant wished to see that he was fully paid for the job. Somewhat influenced by that motivation, plaintiff paid $3,800 to the defendant on the contract with an understanding that the balance of the contract would be paid in the Spring when the work was done.

Between February and May, the plaintiff and Mr. Crandlemire noticed additional discrepancies and deficiencies in the roof. Most importantly, they did not believe the

---

[1] The court accepts the defendant's explanation as more likely than not that the material was placed on the ground for a 24-hour period immediately prior to the installation and that the manufacturer's instruction relates to long-term storage. Furthermore, Mr. Trask testified that the material was protected from the ground and on the top by wood and other unusable pieces of roof sheeting.

roof was fit to a 1/16″ tolerance and there were bare edges where cutting of sheet metal had been done which did not appear to be sealed. Because plaintiff felt that those two representations were a fundamental part of her expectations under the contract, she and Mr. Crandlemire did further inspection of the job.

Defendant was given a window/door screen from plaintiff's home to make repairs. The repairs were completed by the defendant. A dispute arose over whether the repair was made within a reasonable period. Phil Crandlemire complained that defendant had possession of the screen for over two months and had not returned it in a repaired condition. The general manager of the defendant advised Crandlemire that the repairs were made in a timely fashion, the screen was returned to the plaintiff's residence but because no one was home when it was returned, it was set up against the garage in a manner to be seen by the plaintiff. When Mr. Crandlemire denied the truth of that statement, the general manger and Mr. Trask went to the plaintiff's residence where the general manager retrieved the screen and took it to the front door of the residence to hand it to Mr. Crandlemire. Words were exchanged and a struggle ensued. As a result of this confrontation, plaintiff changed her mind in allowing defendant to repair, correct or "cure" the defect. As a result, Mr. Trask asked for a meeting with plaintiff and Mr. Crandlemire. On May 17th, plaintiff and Mr. Crandlemire met with Phil Trask of Woodmaster at plaintiff's home to discuss the deficiencies as noted by the plaintiff. This meeting was surreptitiously videotaped by Mr. Crandlemire hiding a videotape camera on the floor.

Plaintiff and Mr. Crandlemire explained their complaints about the quality of the work that had been performed and also the manner in which they believed defendant's general manager had treated them. Mr. Trask tried to explain the nature of the installation and some of the matters which plaintiff perceived as deficient but continued

to express a willingness to take such action as to complete the job to the satisfaction of the plaintiff and, finally, even agreeing to remove and replace the entire roof. At this offer, Mr. Crandlemire responded by demanding that defendant pay plaintiff for her trouble in addition to replacing the roof.

The gravamen of the dispute in this case is the position of the plaintiff that she was promised a metal roof fit to a 1/16" tolerance with all cut edges factory sealed. Defendant's position, as explained to plaintiff, is that only the full sheets are cut at the factory and they are, indeed, cut to a 1/16" tolerance. Mr. Trask further explains that it is impossible to fit a roof to a house without making new cuts to the metal but that they have the factory supplied paint so that they may affect a "factory seal" on the cut edges on the job. Mr. Trask does not deny that his representatives may have made some reference to factory sealed edges or to 1/16" tolerance but he has no explanation for why a representative of the company would promise a 1/16" fit tolerance and all pieces precut and sealed at the factory. Basically, it is defendant's position that it cannot be done. Mr. Trask testified he has 33 years experience in small building construction with the defendant and has installed over 100 metal roofs.

The plaintiff presented a retired building contractor of some 28 years who has been a professional inspector for nine years. He testified as to a number of deficiencies in the roof in great detail. Some of the deficiencies were agreed to exist by the defendant and some were not. For example, plaintiff's expert asserted that upon his inspection he could find places where appropriate gaskets had not been used or that inappropriate sealing material had been used. Mr. Trask denied that the gaskets had not been used and specifically denied that the inappropriate material complained of by plaintiff's expert had been used or was present on the job. Plaintiff's expert indicated that the metal sheets should have had screws placed in a flat portion. Defendant denied

that requirement and presented evidence that screws were to be placed next to the ridges. Interestingly enough, in spite of all of the disagreements between the two experts, both agreed that a metal roof cannot be fit to a house unless pieces are cut and fit on the scene. They further agree that edges can be factory sealed on site as well as at the factory. In addition to this set of facts raising the issue of interpretation of representations made to the contract, from the evidence the court notes that it is more likely than not that Ms. Voss expected a metal roof known as a raised seamed roof rather than a bi-ribbed roof which was actually installed. In other words, she did not get the roof she expected.

Count I of the complaint alleges that the defendant has breached its contract with the plaintiff. While it seems clear that some of the deficiencies complained of by the plaintiff are, in fact, acceptable in the installation of this kind of roof, the court is satisfied that there were enough deficiencies and problems to make a finding that it is more likely than not that the defendant did not perform under the terms of the contract as it should have, has breached the contract, and should be held liable.

Defendant insists that it was denied a right to cure or correct the deficiencies and had it had an opportunity to do so, the plaintiff would have received exactly what she bargained for under the contract. In order for the court to find the right in a defendant to cure deficiencies in the performance of a contract, it must find that the defendant has substantially performed its responsibilities under the contract. If the installer has simply made slight omissions and defects which can be usually remedied so that the court can consider the ratio of costs of curing the defects to the total contract price, the contractor is entitled to his price less the cost to cure or, may affect the cure and recover the entire contract consideration. In the absence of such substantial performance, the right to cure does not exist. *See Gray v. Weiss*, 519 A.2d 716 (Me. 1986).

In the instant case, whether it is the quality of the work performed by defendant's crew or difficulties presented by a roof with dormers of uneven dimensions, the court is satisfied that there has not been substantial performance under this contract by the defendant and the plaintiff is entitled to recover damages to place her in the position she would have been in but for the breach by awarding the value of the promised performance. There has been no evidence presented specifically as to the value of a properly installed bi-ribbed metal roof. The only amount which may be considered in that regard is the contract price. The contract was an arm's length contract entered into by parties with no special relationship and in the absence of any evidence to the contrary, the court assumes that the $7,650 is the fair market value of the roof in November of 2001.

The second count of plaintiff's complaint charges the defendant with a tort -- fraud. To prevail on a claim for intentional fraud, the plaintiff must prove by clear and convincing evidence (1) that the defendant made a false representation, (2) of a material fact, (3) with knowledge of its falsity or in reckless disregard of whether it is true or false, (4) for the purpose of inducing the plaintiff to act in reliance upon it, and (5) the plaintiff justifiably relied upon the representation as true and acted upon it to the plaintiff's damage. *See Rand v. Bath Iron Works*, 2003 ME 122, 832 A.2d 771. The standards for the court to find fraud is that there must be evidence to prove the fraud by clear and convincing evidence. In such a case, the party with the burden of persuasion may prevail only if he can place in the ultimate factfinder an abiding conviction that the truth of his factual contentions are highly probable. *Taylor v. Commissioner, Mental Health & Mental Retardation*, 481 A.2d 139 (Me. 1984). The court is satisfied that the plaintiff has presented evidence with regard to the 1/16" tolerance and factory seal of material fact, that it was for purpose of inducing the plaintiff to enter into

the contract in reliance upon the representation and Ms. Voss justifiably relied upon the representation as true and acted upon it to her damage. The court is not satisfied that there is clear and convincing evidence that the defendant made a false representation with knowledge that it was making a false representation or recklessly disregarding whether the representation was true or false. The court concludes that based upon all the evidence, it is more likely than not that the representative of the defendant negligently represented the two important elements to the plaintiff by failing to assure that she understood the import of the representations made. Under these circumstances, the plaintiff cannot prevail on her claim of fraud.

However, that does not resolve the issue completely. One who, in the course of his business, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in communicating the information. RESTATEMENT (2ND) OF TORTS § 552(1) (1977) as cited in *Chapman v. Rideout*, 568 A.2d 829 (Me. 1990). This tort of negligent misrepresentation must be proven by a preponderance of the evidence. Its elements are that the plaintiff establish that (1) defendant supplied false information, (2) of a material fact, (3) to guide the plaintiff in his business transactions, (4) that the defendant failed to exercise reasonable care or competence in communicating the information, and (5) the plaintiff justifiably relied upon the information as true and acted upon it causing him economic loss. *Id.* It would appear from the evidence that the defendant negligently misrepresented that which plaintiff would receive by supplying information which reasonably could be interpreted to be a result not consistent with actual performance but also the standards of installation of this metal roof. The defendant led the plaintiff to believe that the roof could be applied and fit to a 1/16" tolerance and that the factory

seal would prevent any cut edges in the application. Clearly, the defendant failed to exercise reasonable care in communicating the information and the plaintiff justifiably relied upon the information and entered into a contract resulting in damage to her property.

The plaintiff has not made a claim for negligent misrepresentation in her complaint. The legal question was not presented at trial and the parties did not reach an express agreement to litigate that precise doctrine. The court, analyzing the evidence, is satisfied that the elements of the tort have been proven by preponderance and relies upon M.R. Civ. P. 15(b):

> When issues not raised by the pleadings are tried by . . . implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial or these issues.

In examining the elements of fraud in light of the elements of negligent misrepresentation and after full review of the evidence in this case, the court is satisfied that a claim of negligent misrepresentation was tried and proved. There was no motion to amend. The court is reaching this conclusion *sua sponte* after trial. *See Bernier v. Merrill Air Engineers*, 2001 ME 17, 770 A.2d 97.

Count III of plaintiff's complaint alleges violation of the Maine Unfair Trade Practices Act (UTPA), 5 M.R.S.A. Part I, Chapter 10. Plaintiff relies on two grounds for the establishment of a violation of the UTPA, first, fraud, and secondly, violations of the warranty provisions of the Uniform Commercial Code (UCC). The court has not found fraud in this case and the UCC does not apply to a contract the predominant feature of which is services rather than goods. Under the UTPA, 5 M.R.S.A. § 207 provides: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct

of any trade or commerce are declared unlawful." In order to find a violation of this Act, the court must be satisfied that the activities of the defendant were unfair or deceptive and requires an act of intentional giving of false impression. BLACK'S LAW DICTIONARY 7TH ED. The plaintiff is entitled to recover from the defendant for defendant's negligence, not its deceit. There is nothing in the defendant's acts in the creation of this contract which rises to the level of unfairness required by the UTPA.

The court has previously determined that, as a matter of law, under the circumstances of this case, the defendant does not have a legal right to cure or correct deficiencies. The concept of fairness under the UTPA creates a requirement for an analysis taking into consideration the defendant's offer to correct deficiencies. It is agreed that a representative of the defendant at a meeting held to attempt to resolve differences offered to remove and completely reinstall a Bi-ribbed steel metal roof. It is also undisputed that this was accepted by the plaintiff provided the defendant paid to the plaintiff all collateral expenses arising out of the disagreement which the defendant declined to do. The court examines this set of circumstances in light of both a doctrine of fairness under the UTPA as well as the obligation on the part of the plaintiff to mitigate her damages.

"Fair" is defined as impartial; just; equitable; disinterested. BLACK'S LAW DICTIONARY, 7th ed. Assuming the offer by the defendant to remove the deficient roof and install a new roof in accordance with the contract would have provided what the plaintiff bargained for, including any repairs to the pre-existing roof and siding acknowledged by the defendant, the court finds that such an offer removed any unfairness that might have existed from the previous negligent action by the defendant's representatives. Secondly, at the time the defendant made the offer to replace the roof, it also had fully disclosed the nature of the roof project and such

disclosure corrected any misunderstanding on the part of the plaintiff thereby removing any unfairness created by the misrepresentation. Furthermore, the obligation of both parties to proceed in good faith under the contract was met by the defendant after observing the deficiencies in the installation and the misunderstanding by negligent misrepresentations by its own agents.[2]

Count IV of plaintiff's complaint alleges breach of express warranties and count V breach of implied warranty. The contract provides, "25 year warranty on steel roofing." There is nothing in the evidence to suggest the goods, the steel roofing, was deficient in any way. The performance of which the plaintiff complains is in the application. Under the principles of implied warranty, the warranty is the performance of the contract. The court has already found that breach.

Plaintiff argues that further evidence of defendant's violation of the UTPA is defendant's violation of implied warranties of merchantability and fitness implicating 11 M.R.S.A. § 2-316(5)(a). Plaintiff quotes paragraph 16 of the contract in question containing the sentence, "Warranty rights and remedies set forth in the Maine Uniform Commercial Code apply to this contract."[3] Plaintiff goes on to utilize the provision of the Uniform Commercial Code that indicates that a violation of the UCC addressing the implied warranty of merchantability, 11 M.R.S.A. § 2-314, implied warranty for fitness, 11 M.R.S.A. § 2-315, and exclusion or modification of warranties, 11 M.R.S.A. § 2-316,

---

[2] The court is troubled by the activities of Mr. Crandlemire in these entire circumstances. It is clear from his activities that he did not trust the defendant from the very beginning starting with a videotape of the material placed on the premises prior to installation through the physical confrontation with defendant's representation and the surreptitious videotaping of the meeting called to resolve differences. Furthermore, the demand, initiated by Mr. Crandlemire, to require the defendant to pay extraordinary expenses in order to allow the defendant to replace the roof, at that stage of the proceeding, was clearly unreasonable. Although Mr. Crandlemire is not a plaintiff but a domestic partner and witness to the proceedings, the court finds his credibility to be highly suspect and lacking good faith.
[3] The implication of this paragraph in a "boilerplate contract" form is unclear. This court does not believe that parties to a contract may incorporate law specifically not applicable. Or it only applies to materials, not at issue in this case.

arising from a retail sale of "consumer goods and services" constitutes a violation of Title 5, ch. 10, Unfair Trade Practices Act. Plaintiff goes on to argue that defendant is a merchant as defined by 11 M.R.S.A. § 2-104 and a definition that, "consumer goods and services are those new or used goods and services, including mobile homes, that are used or bought primarily for personal, family or household purposes." 11 M.R.S.A. § 2-316(5).

Plaintiff further cites to *Sylvain v. Masonite Corp.*, 471 A.2d 1039 (Me. 1984), where the court found that defective house siding material breached the implied warranty of merchantability.[4] Plaintiff further goes on to cite *State of Maine ex rel. v. Tierney*, 436 A.2d 866 (Me. 1981), for the purposes of guidance in the court's interpretation of the language found in the UCC.

The defendant, in its memorandum, also relies on *State of Maine, ex rel., Tierney v. Ford Motor Company*, 436 A.2d 866 arguing for an interpretation in its favor. Defendant also cites *Suminski v. Maine Appliance Warehouse, Inc.*, 602 A.2d 1173 (Me. 1992), making reference to implied warranties created by 11 M.R.S.A. § 2-314.

Neither party has addressed the issue of jurisdiction and application of the Maine Uniform Commercial Code. Article 2 of that Code governs the matter of "sales." Title 11 M.R.S.A. § 2-102 provides, "Unless the context otherwise requires, this Article applies to transactions in goods; . . .." Title 11 M.R.S.A. § 2-103 defines a "buyer" as a person who buys or contracts to buy goods and a "seller" is a person who sells or contracts to sell goods. Title 11 M.R.S.A. § 2-104 defines a "merchant" as a person who deals in goods. Title 11 M.R.S.A. § 2-105 defines "goods" as "all things (including specially manufactured goods) which are movable at the time of identification to the

---

[4] The court notes that this was an action by a consumer against a manufacturer for the sale of hardboard siding.

contract for sale other than the money in which the price is to be paid." Title 11 M.R.S.A. § 2-106 defines "contract" and "agreement" as "limited to those relating to the present or future sale of goods." The warranty sections of the Sales Article of the UCC include section 2-312, Warranty of Title, as to goods, section 2-316 as to express warranties relating to goods, section 2-314 relating to implied warranty of merchantability as to goods, section 2-315 as to implied warranty for fitness as to a particular purpose for which the goods are required and finally the section relied upon in this case, section 2-316, exclusion or modification of warranties. Notwithstanding the language as to "sales of consumer goods or services" and "consumer goods and services," the context of the article on sales is the sale of goods and not services.

This statutory application then requires the court to determine whether the contract in question is for goods or services or both. Under the title "work to be performed," the defendant promises to inspect the roof and re-nail as needed, strap the roof, install Bi-ribbed steel roofing, provide accessories, vented ridge cap and closure strips, and includes all labor, materials, taxes and permits. It also provides an express 25-year warranty on the steel roofing.

The present contact provides for the sale of both goods and services. This court is required to determine whether the "predominant feature of the transaction" relates to goods or to services. *Smith v. Urethane Installations, Inc.*, 492 A.2d 1266, 1268 (Me. 1985); (citing *Arvida Corp. v. A.J. Industries, Inc.*, 370 So.2d 809 (Fla. App. 1979); *Air Heaters, Inc. v. Johnson Electric, Inc.*, 258 N.W.2d 649 (N. D. 1977)). In *Smith*, the court was required to determine the nature of the contract for the insulation of a home. The court found that the predominant feature of the Urethane contract was provision of a service, namely the insulation of a home. Among other reasons for its conclusion, the court found that, "The nature of the 'goods,' foam insulation, is difficult to conceptualize in the absence

of installation." *Smith*, 492 A.2d at 1268. This conclusion was further reinforced in *Lucien Bourque, Inc. v. Cronkite*, 557 A.2d 193 (Me. 1989). This involved a contract for excavation and construction work. "When as here the transaction involves provision of both goods and services, the question for the application of the UCC becomes whether as a factual matter the transaction predominantly relates to goods." *Id.* at 195.

In the present case, it is clear that labor and service, rather than the roofing materials, are the predominant features of the agreement. One cannot conceptualize the nature of the goods in this instance in the absence of installation. They have no value to the plaintiff and no purpose in the contract except as installed. Furthermore, plaintiff has asserted no complaint as to the quality, merchantability or fitness as to the materials supplied. The complaint is in its installation. Accordingly, the court is satisfied that Article 2 of the Maine Uniform Commercial Code does not apply to the transaction in question.

Plaintiff's and defendant's experts in this area disagree on the issue of whether irreparable damage was done to the pre-existing siding over plaintiff's home by the defendant's roof installation. To the extent portions of the siding would be required to be replaced, the plaintiff's position is that because of the age of the pre-existing siding, any new siding used as replacement would not be weathered or faded in order to match the siding color. Accordingly, plaintiff seeks new siding for the entire home as part of her damages. It appears to be defendant's position that reinstallation of a new roof in accordance with the contract would provide for appropriate repair to the siding and to flashing surrounding the chimney.

Plaintiff's expert had not been disclosed to be prepared to testify as to the cost to plaintiff resulting from a new roof. The plaintiff was allowed to testify that her understanding from hearsay with other contractors was a cost of approximately $1,000

to $2,000 to remove the existing deficient roof and $8,000 to replace the siding on her house. Obviously, these amounts are not subject to cross-examination and the plaintiff does not qualify as an expert to render such an opinion. Therefore, there is no evidence presented by the plaintiff as to these costs. However, it is clear that replacing the roof, even under the terms of the original contract, will require some repair to the siding of the existing structure.

Because of defendant's negligence, plaintiff has been deprived of the use of her funds since November of 2001 in the amount of $1,530 and since February of 2002 in the amount of $3,800 to which she is entitled to compensation. In addition, in order to have reinstalled the roof represented, she will need to remove the existing roof. Further, the fair market value of $7,650 as of November of 2001 is affected by the passage of time. Finally, from all the testimony in the case, it appears that some repairs will be necessary for the interfacing of a roof with the siding of the dormers as well as the chimney flashing. For all those elements, the court finds the sum of $4,000 to be appropriate damages accruing from the negligence.

The entry will be:

Judgment for plaintiff in the amount of $11,650 on her complaint; judgment for plaintiff on defendant's counterclaim; judgment for plaintiff for pre-judgment interest at the rate of 2.41%; post-judgment interest to run at the rate of 8.477%.

Dated: August 12, 2005

Donald H. Marden
Justice, Superior Court

LINDA J VOSS  - PLAINTIFF
25 HIGHLAND AVE
WATERVILLE ME 04901
Attorney for: LINDA J VOSS
JED DAVIS  - RETAINED 05/05/2003
MITCHELL & DAVIS
86 WINTHROP STREET
AUGUSTA ME 04330

vs
WOODMASTER OF MAINE INC - DEFENDANT

Attorney for: WOODMASTER OF MAINE INC
RICHARD FOLEY  - RETAINED
FARRIS FOLEY & DICK
88 WINTHROP STREET
AUGUSTA ME 04330

Attorney for: WOODMASTER OF MAINE INC
WADE A RILEY  - LIMITED
FARRIS FOLEY & DICK
88 WINTHROP STREET
AUGUSTA ME 04330

**DOCKET RECORD**

Filing Document: COMPLAINT                    Minor Case Type: CONTRACT
Filing Date: 05/05/2003

## Docket Events:

05/06/2003 FILING DOCUMENT - COMPLAINT FILED ON 05/05/2003
           CASE TRANSFERRED FROM KENNEBEC SUPERIOR COURT

05/06/2003 Party(s):  LINDA J VOSS
           ATTORNEY - RETAINED ENTERED ON 05/05/2003
           Plaintiff's Attorney: JED DAVIS

05/06/2003 Party(s):  WOODMASTER OF MAINE INC
           ATTORNEY - RETAINED ENTERED ON 04/23/2003
           Defendant's Attorney: RICHARD FOLEY

05/06/2003 Party(s):  WOODMASTER OF MAINE INC
           SUMMONS/SERVICE - ACCEPTANCE OF SERVICE FILED ON 04/11/2003
           Defendant's Attorney: RICHARD FOLEY

05/06/2003 Party(s):  WOODMASTER OF MAINE INC
           RESPONSIVE PLEADING - ANSWER & COUNTERCLAIM FILED ON 04/23/2003
           Defendant's Attorney: RICHARD FOLEY

05/06/2003 Party(s):  LINDA J VOSS
           RESPONSIVE PLEADING - REPLY/ANSWER TO COUNTERCLAIM FILED ON 05/02/2003
           Plaintiff's Attorney:  JED DAVIS

05/12/2003 Party(s):  WOODMASTER OF MAINE INC
           ATTORNEY - LIMITED ENTERED ON 04/28/2003
           Defendant's Attorney: WADE A RILEY