STATE OF MAINE
CUMBERLAND, ss

BUSINESS AND CONSUMER COURT
Location: Portland
Docket No.: BCD-AP-13-03

✓

CENTRAL MAINE HEALTHCARE
CORP., CENTRAL MAINE MEDICAL
CENTER, DIETER KRECKEL, ALAN
VERRILL, WILLIAM LEE, and
DANIEL TRAFFORD,

        Petitioners/
        Plaintiffs

v.

BUREAU OF INSURANCE,

        Respondent/
        Defendant

and

ANTHEM HEALTH PLANS OF
MAINE, INC.,

        Intervenor

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## ORDER ON INTERVENOR ANTHEM HEALTH PLANS OF MAINE, INC.'S AND RESPONDENT BUREAU OF INSURANCE'S PARTIAL MOTIONS TO DISMISS

On August 9, 2013, Petitioners Central Maine Healthcare Corp. (CMHC), Central Maine Medical Center, Dieter Kreckel, Alan Verrill, William Lee, and Daniel Trafford filed an Amended Complaint seeking: 1) disclosure of certain documents pursuant to the Freedom of Access Act (FOAA), 1 M.R.S. §§ 400-14 (2012), (Count I); and 2) a declaratory judgment that the Bureau of Insurance's protocol for handling confidential information violates FOAA and is otherwise invalid (Count II). Intervenor Anthem Health Plans of Maine, Inc. (Anthem) and

1

Respondent Bureau of Insurance (the Bureau) move, pursuant to M.R. Civ. P. 12(b)(6), to dismiss the Amended Complaint except as to certain documents that have not yet been disclosed by the Bureau.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are drawn from CMHC's complaint and the initial record filed by the parties and are presumed to be true.[1] *See Johnston v. Me. Energy Recovery Co., Ltd. P'ship*, 2010 ME 52, ¶2, 997 A.2d 741; *Moody v. State Liquor & Lottery Comm'n*, 2004 ME 20, ¶20, 843 A.2d 43. In April of 2013, Anthem began the process of seeking approval of a new qualified health plan that would replace its current individual and small group plans. (Compl. ¶¶9-10.) As part of that process, Anthem filed numerous documents with the Bureau that it designated as confidential. (*See* Compl. ¶13; R. 3.)

On May 23, 2013, CMHC sent a FOAA request to the Bureau requesting documents related to Anthem's application for certification of a new health plan. (Compl. ¶11; R. 1.) On May 31, 2013, the Bureau responded by letter that it had received and was processing the FOAA request and, pursuant to its existing "protocol," would be "withholding certain responsive documents pending resolution of [Anthem's] request that those documents be given confidential treatment." (R. 3.) Also on May 31, 2013, Anthem formally filed its application for approval of two new Access Plans to be used beginning on January 1, 2014. (Compl. ¶12.)

The Bureau's "protocol" addresses the conflict between a document filer or applicant's assertion of confidentiality over documents filed with the Bureau and the presumption of public scrutiny for agency records. *See* 1 M.R.S. §§ 401, 408-A. (*See also* R. 66-68 (containing the

---

[1] Because many of the relevant documents in this matter were public records, the parties agreed to and filed an initial record for the Court's consideration. Several of the documents included in the initial record were also attached as exhibits to CMHC's Amended Complaint. For ease of reference, the Court use citations to the initial record for these documents.

Bureau's protocol).) The protocol instructs the filer or applicant how to designate documents as confidential and delineates how the Bureau will resolve requests for documents designated as confidential:

> Should a third party seek access to a document that is subject to your assertion of confidentiality, you will be provided an opportunity to present argument in support of the validity of your assertion as of that time. The requesting party will also be provided an opportunity to present argument in support of the requested access. The Bureau will review the arguments and make a determination as to whether or not it believes the document is available to the third party. Should that determination be adverse to you, you will be provided an opportunity to seek judicial relief before the document is released.

(R. 66, 67.) The protocol is published on the Bureau's website, but has not been adopted as a formal rule.[2] (Compl. ¶20.)

On June 6, 2013, CMHC orally reiterated its May 23 FOAA request to the Bureau, and specifically requested access to the May 31 Anthem filing. (Compl ¶15.) Later that day, the Bureau responded to CMHC's FOAA request in a detailed letter identifying all the documents it was releasing to CMHC with the letter and those documents the Bureau was withholding pending a determination of confidentiality pursuant to the protocol. (Compl. ¶15; R. 4-8.) The Bureau notified Anthem of the FOAA request, and Anthem and CMHC proceeded to follow the protocol regarding CMHC's request through June 19, 2013. (R. 9-23.)

On June 21, 2013, the Bureau concluded its review of documents responsive to CMHC's FOAA request and released some but not all of the requested documents. (R. 24-30.) In subsequent letters dated June 26, July 2, and August 28, the Bureau released to CMHC further documents or provided updated versions of previously released documents. (R. 31-34.) To date, only a handful of documents have not been released to CMHC based upon the Bureau's determination that those documents are not public records.

---

[2] *See Confidential Treatment of Documents: Bureau of Insurance*, MAINE.GOV, http://www.maine.gov/pfr/insurance/company/confidential_treatment.htm (last updated August 22, 2012).

Meanwhile, on June 6, 2013, the Superintendent of Insurance published a notice regarding Anthem's application for approval of two new health plans that set a public hearing for June 28, 2013, and established a process and deadline for parties wishing to intervene in the matter. (Compl. ¶ 17; R. 35-37.) On June 11, 2013, Petitioners moved to stay the administrative proceeding, asserting that they could not ascertain how the Anthem plans would affect them because the Bureau had not released any information on the plans.[3] (Compl. ¶21; R. 38-42.) The Bureau denied the motion on the following day. (Compl. ¶22; R. 43-48.)

Petitioners filed the instant proceeding on June 13, 2013, in Kennebec County Superior Court as a Rule 80C administrative appeal of the Bureau's refusal to stay consideration of Anthem's application and also asserted independent claims for FOAA violations and declaratory relief. CMHC voluntarily dismissed its administrative appeal on June 21, 2013, and then filed its Amended Complaint on August 9, 2013. The matter was approved for transfer to the Business and Consumer Court on June 27, 2013. The Court heard oral argument on the present motions on October 2, 2013.

## STANDARD OF REVIEW

A motion to dismiss pursuant to M.R. Civ. P. 12(b)(6) "tests the legal sufficiency of the complaint and, on such a challenge, the material allegations of the complaint must be taken as admitted." *Shaw v. S. Aroostook Cmty. Sch. Dist.*, 683 A.2d 502, 503 (Me. 1996) (quotation marks omitted). "The complaint is viewed 'in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory.'" *Ramsey v. Baxter Title Co.*, 2012 ME 113, ¶ 6, 54 A.3d 710 (quoting *McCormick v. Crane*, 2012 ME 20, ¶ 5, 37 A.3d 295). "The purpose of a complaint

---

[3] The motion was brought on behalf of three unknown parties, i.e., subscribers and doctors who had no notice of the proceedings but may be affected by Anthem's proposed plans. (R. 39.) These same unknown parties were also named as Petitioners when this case was initiated, but they were dropped when the Amended Complaint was filed. This order does not mention them further.

4

in modern notice pleading practice is to provide defendants with fair notice of the claim against them." *Shaw*, 683 A.2d at 503 (quotation marks omitted). "A complaint is properly dismissed when it is beyond doubt that the plaintiff is entitled to no relief under any set of facts that might be proven in support of the claim." *Richardson v. Winthrop Sch. Dep't*, 2009 ME 109, ¶ 5, 983 A.2d 400 (quotation marks omitted).

## DISCUSSION

### I. Count I: FOAA

"The purpose of FOAA is to open public proceedings and require that public actions and records be available to the public." *Town of Burlington v. Hosp. Admin. Dist. No. 1*, 2001 ME 59, ¶ 13, 769 A.2d 857. FOAA mandates the disclosure of public records: "Except as otherwise provided by statute, a person has the right to inspect and copy any public record in accordance with this section within a reasonable time of making the request to inspect or copy the public record." 1 M.R.S. § 408-A. A public record is "any written, printed, or graphic matter . . . that is in the possession or custody of an agency . . . and has been received or prepared for use in connection with the transaction of public or governmental business." 1 M.R.S. § 402(3). FOAA included numerous exceptions from the definition of public record, including those records that are deemed confidential by statute or by evidentiary privilege. *See* 1 M.R.S. § 403(A), (B). A "person aggrieved by a refusal or denial to inspect or copy a record under section 408-A may appeal, within 5 working days of the receipt of the written notice of denial, to any Superior Court within the State." 1 M.R.S. § 409(1).

In its Amended Complaint, CMHC asserts that the Bureau unlawfully withheld public records in response to its FOAA request because the withheld documents are not in fact confidential. (Compl. ¶¶ 26-30.) CMHC also asserts that the Bureau's protocol is in violation of FOAA. (Compl. ¶ 30.) As a remedy, CMHC seeks an order of disclosure for the withheld

5

documents, *see* 1 M.R.S. § 409(1); civil forfeiture in the amount of $500 for the Bureau's willful non-disclosure of the withheld documents, *see* 1 M.R.S. § 410; and reasonable attorney fees and expenses for the Bureau's bad faith refusal to provide public records, *see* 1 M.R.S. § 409(4). (Compl. at 7-8.)

A.    *Standing*

Both the Bureau and Anthem assert that the named Petitioners other than CMHC must be dismissed from the suit for lack of standing because they made no FOAA request and thus have not been injured. *See Mortg. Elec. Regis. Sys., Inc. v. Saunders*, 2010 ME 79, ¶ 7, 2 A.3d 289 (explaining that standing is evidenced by "a particularized injury to the party's property, pecuniary, or personal rights"). CMHC concedes that the other named Petitioners did not make a FOAA request and thus do not have standing to assert a FOAA claim. The Court will accordingly dismiss the claims of those Petitioners with respect to Count I.

B.    *Timeliness*

Anthem asserts that the Court should dismiss CMHC's appeal as to its "first" FOAA request of May 23, 2013, as untimely because CMHC did not appeal within the statutorily mandated five-day time period when it received the Bureau's May 31, 2013, response. *See* 1 M.R.S. § 409(1); *Guy Gannett Publ'g Co. v. Me. Dep't of Pub. Safety*, 555 A.2d 474, 475-76 (Me. 1989). Anthem distinguishes between the written May 23 request and the oral June 6 reiteration of that request.

Viewing the complaint in the light most favorable to CMHC, the Court cannot say that the May 31 response triggered CMHC's appeal period. The Law Court has interpreted FOAA to require a response from a governmental agency within five working days from the request; the failure to respond at all within that time period "is deemed a denial of the request for documents" and triggers the appeal period. *Cook v. Lisbon Sch. Comm.*, 682 A.2d 672, 680 (Me.

1996); *see also* 1 M.R.S. § 409(1). The Law Court has not held, however, that a response from the agency within the 5-day period indicating receipt of the request should also be deemed a denial. *Cf.* 1 M.R.S. § 408-A (providing that a person has the right to inspect public records "within a *reasonable* time of making the request" (emphasis added)). Moreover, such an interpretation could lead to a plethora of cautionary but unnecessary appeals and does not promote efficient use of party, agency or judicial resources.

Further, although the May 31 letter states that the Bureau would be withholding certain documents responsive to the request, the letter does not reveal which documents it planned on withholding. Any appeal by CMHC from this alleged "refusal" to disclose public records may have been unripe because at that time CMHC had no knowledge of which documents were being or would be withheld. The Bureau fully responded by CMHC's request on June 6, 2013. (R. 4.) CMHC's appeal from the June 6, 2013, letter was within the 5-day appeal period of section 409(1) and is thus timely.

Finally, to the extent that Anthem is suggesting that its May 31 application is not responsive to the May 23 request because it had not been filed as of the date of CMHC's request, the court rejects that contention. The May 23 FOAA request specifically sought "[a]ll records in the possession of the Bureau relating to Anthem's application for certification of a Qualified Health Plan since April 1, 2013." (R. 1.) The request plainly encompasses documents in the possession of the Bureau at any time between the request and before the Bureau's response.

C.  *Civil forfeiture remedy*

The Bureau asserts that CMHC cannot assert a violation of 1 M.R.S. § 410 because only the Attorney General can enforce that provision. The Court agrees. Since the Law Court decided *Cook v. Lisbon School Committee*, the law has been clear that only the Attorney General

7

may seek civil forfeiture pursuant to section 410. 682 A.2d at 680; *see also Lewiston Daily Sun v. Sch. Admin. Dist. No. 43*, 1999 ME 143, ¶ 11, 738 A.2d 1239; *Scola v. Town of Sanford*, 1997 ME 119, ¶ 7, 695 A.2d 1194.

CMHC seeks to avoid this result by pointing out that these cases presume the existence of an award of costs as an alternative to civil forfeiture, an opportunity that has been limited since the enactment of 1 M.R.S. § 409(4). *See* P.L. 2009, ch. 240, § 1 (effective June 2, 2009). CMHC misreads *Cook*. The unavailability of civil forfeiture was not based on the availability of costs; the unavailability of forfeiture was based on statutory authority that only the Attorney General may enforce civil violations. *See Cook*, 682 A.2d at 680 (citing 17-A M.R.S.A. § 4-B (Supp. 1995)). The law remains the same today. *See* 17-A M.R.S. § 4-B(1) (2012).

D.    *Mootness*

Finally, the primary challenge of both the Bureau and Anthem is whether CMHC's FOAA claim is moot because the Court cannot grant CMHC any relief. Neither the Bureau nor Anthem challenge CMHC's FOAA claim with respect to records in the Bureau's custody that have yet to be disclosed to CMHC. Instead, both the Bureau and Anthem assert that to the extent CMHC is seeking disclosure of documents that have been produced after the filing of CMHC's claim, CMHC's FOAA action is moot and should be dismissed. The Bureau characterizes CMHC's FOAA challenges primarily as challenges to the process by which the Bureau responded to CMHC's request and the utilization of the protocol in that process. Because that process is now complete, the Bureau asserts that there is no specific relief the Court can order regarding that process. Anthem makes similar arguments.

"A case . . . may become moot, and hence not justiciable, if the passage of time and the occurrence of events deprive the litigant of an ongoing stake in the controversy although the case raised a justiciable controversy at the time the complaint was filed." *Halfway House, Inc. v.*

8

*City of Portland*, 670 A.2d 1377, 1379-1380 (Me. 1996). Courts only decide "questions of live controversy, and not hypothetical, abstract, or moot questions." *Sevigny v. Home Builders Ass'n of Me., Inc.*, 429 A.2d 197, 201 (Me. 1981). Nevertheless, the Law Court repeatedly has stated that "[a] governmental body cannot moot a claim of violation of [FOAA] by making disclosure long after the original request." *Campbell v. Town of Machias*, 661 A.2d 1133, 1135 (Me. 1995). FOAA "mandates a prompt response from the agency." *Cook*, 682 A.2d at 679.

When CMHC initiated this case, the Bureau had not provided many of the documents requested by CMHC, and thus the case presented a justiciable controversy. At this juncture in the litigation, however, the Bureau has provided to CMHC all but a handful of the documents it sought in its FOAA request. It is true that ordering the disclosure of already disclosed documents would be somewhat superlative, but disclosure is not all that CMHC is seeking. CMHC also asserts that all of the documents requested were not confidential in the first instance and the failure to provide them in a timely manner constitutes a FOAA violation. Moreover, CMHC is seeking attorney fees pursuant to 1 M.R.S. § 409(4), meaning that the court has to decide whether there was a violation that could trigger any entitlement to attorney fees. *See Cook*, 682 A.2d at 680.

Presuming the facts in the Amended Complaint as true, the Court cannot state that it does not state a cause of action with respect to all the documents sought by CMHC, regardless of whether those documents have been already provided. The complaint alleges that all of the application materials sought by CMHC were public records, that the Bureau made no assertion that they were exempt from the definition of public record, that the Bureau withheld the documents because *Anthem* asserted they were confidential, and that the Bureau also withheld production of public records pursuant to a "non-statutory, non-regulatory protocol." (Compl. ¶¶ 13-14, 19-20.) The Amended Complaint also asserts that the refusal to produce non-

9

confidential documents because Anthem designated them as confidential constitutes bad faith. (Compl. ¶¶ 29-30.) The Court cannot say that if proved, these facts would not entitle CMHC to relief. *See Ramsey*, 2012 ME 113, ¶ 6, 54 A.3d 710; *Cook*, 682 A.2d at 680.

B.     Count II: Declaratory Judgment

Petitioners seek a declaratory judgment that the protocol is contrary to FOAA and that the Bureau cannot deny requests for public documents in reliance on that protocol. (Compl. ¶ 39.) Petitioners assert there is an ongoing controversy regarding the intersection of FOAA and the protocol, and that the protocol is not a valid rule or regulation adopted pursuant to the Administrative Procedures Act, 5 M.R.S. §§ 8001-11008 (2012). (Compl. ¶ 36.)

The Bureau first contends that the claims of Petitioners other than CMHC must be dismissed because they made no request of the Bureau and thus have no standing to sue regarding the protocol. As alleged in the Complaint, the Court agrees. The other named Petitioners are identified in the Complaint, but the Complaint does not reveal any particularized injury suffered by these Petitioners from acts of the Bureau. *See Stull v. First Am. Title Ins. Co.*, 2000 ME 21, ¶ 11, 745 A.2d 975. Importantly, the Amended Complaint does not state how the protocol directly affected or aggrieved any Petitioner other than CMHC. An assertion of general injury is not enough to confer standing on these Petitioners. *See Storer v. Dept't of Envtl. Prot.*, 656 A.2d 1191, 1192 (Me. 1995).

As to CMHC's claim for a declaratory judgment, the Court is not persuaded by the Bureau's or Anthem's arguments. CMHC has alleged sufficient facts to make out a claim against the Bureau for a declaratory judgment that the protocol violates FOAA. Moreover, the Administrative Procedures Act specifically permits a party to seek a declaratory judgment to challenge "an agency rule" or "an agency's refusal or failure to adopt a rule where the adoption of a rule is required by law." 5 M.R.S. § 8058 (2012). (*See* Compl. ¶¶20, 36.)

10

## CONCLUSION

Based upon the foregoing, the court orders as follows:

1. The motions filed by the Bureau of Insurance and Anthem Health Plans of Maine to dismiss Count I are:

   a. GRANTED as to the claim of Petitioners Central Maine Medical Center, Dieter Kreckel, Alan Verrill, William Lee, and Daniel Trafford;

   b. GRANTED as to the relief of civil violation; and

   c. DENIED as to the balance of the motion.

2. The motions filed by the Bureau of Insurance and Anthem Health Plans of Maine to dismiss Count II are:

   a. GRANTED as to the claim of Petitioners Central Maine Medical Center, Dieter Kreckel, Alan Verrill, William Lee, and Daniel Trafford; and

   b. DENIED as to the balance of the motion.

Pursuant to M.R. Civ. P. 79(a), the clerk is instructed to incorporate this order into the docket by reference.

Dated Nov. 12, 2013

_____

A.M. Horton
Justice, Maine Business & Consumer Court

Entered on the Docket: 11.12.13
Copies sent via Mail ___ Electronically ✓

11

STATE OF MAINE                                    BUSINESS AND CONSUMER COURT

Cumberland, ss.


CENTRAL MAINE HEALTHCARE CORPORATION

Petitioner

v.                                                    Docket No. BCD-AP-13-03

MAINE BUREAU OF INSURANCE

Respondent

ANTHEM HEALTH PLANS OF MAINE, INC.

Intervenor


**DECISION AND JUDGMENT**

Pursuant to the Maine Freedom of Access Act ("FOAA"), 1 M.R.S. § 409, Petitioner

Central Maine Healthcare Corporation ("CMHC") appeals from the decision of Respondent

Maine Bureau of Insurance ("Bureau") to withhold disclosure of documents in response to

CMHC's request under FOAA for access to documents filed with the Bureau by Intervenor

Anthem Health Plans of Maine, Inc. ("Anthem") [1].

CMHC also seeks a declaratory judgment that the Bureau's published protocol for

processing FOAA requests for documents alleged to be confidential is "contrary to statute, and

that its assertion of its 'Protocol' as a basis for denying access to public records violates

FOAA." Amended Complaint Appealing The Denial of Requests for Public Records Pursuant

---

[1]  The action was originally brought in the name of CMHC and other named plaintiffs, but the other named plaintiffs were dismissed for lack of standing, given that the FOAA request at issue was made by CMHC only. *See* Order on Intervenor Anthem Health Plans of Maine, Inc.'s and Respondent Bureau of Insurance's Partial Motions to Dismiss (Nov. 12, 2013).

to 1 M.R.S. § 409 and Declaratory Judgment Action Pursuant to 14 M.R.S. § 5951 Et Seq. at 7 ["Amended Complaint"].

Anthem, a health insurer regulated by the Bureau, filed the documents that were the subject of CMHC's FOAA request in connection with Anthem's application to the Bureau for approval of provider networks proposed for Anthem's health insurance plans to be offered in compliance with the Affordable Care Act.

CMHC advances three essential contentions:

- "Through use of its non-statutory, non-regulatory protocol, which in this instance led to delay and non-disclosure, and failure to redact any documents, [t]he Bureau violated the Freedom of Access Act and continued use of the Protocol is a continuing violation of FOAA for which Plaintiffs are entitled to Declaratory Judgment." CMHC Memorandum of Law at 8-12. *See* Amended Complaint, Ct. II, ¶¶ 34-39

- The Bureau has violated and continues to violate FOAA by withholding documents requested by CMHC. Amended Complaint, Ct. I, ¶¶ 26-33; *see* CMHC Memorandum of Law at 12-16.

- CMHC contends that the Bureau acted in bad faith in violating FOAA and should be required to pay CMHC's attorney fees and litigation expenses pursuant to FOAA.[2] *See* Amended Complaint at 7.

The Bureau and Anthem oppose all of CMHC's claims.

An evidentiary hearing was held December 11 and December 20, 2013, after which the parties filed briefs and proposed findings, and presented oral argument. Based on the entire record, the court hereby makes and adopts the following findings of fact and conclusions of law.

## I. Factual Background

The context in which CMHC's FOAA requests for Anthem's regulatory filings were made is relevant to the timing and substance of the Bureau's response to the requests and

---

[2] CMHC's Amended Complaint also sought a civil forfeiture under 1 M.R.S. § 410. That prayer for relief has been dismissed on the ground that CMHC lacks standing to seek a civil forfeiture. *See* Order on Intervenor Anthem Health Plans of Maine, Inc.'s and Respondent Bureau of Insurance's Partial Motions to Dismiss at 7-8 (Nov. 12, 2013).

therefore needs to be set forth in some detail. Some of the relevant facts are outlined in this court's Decision on Appeal in another case involving the same three parties and others, *Kimball v. Superintendent of Insurance*, Me. Bus. & Cons. Ct., Docket No. BCD-AP-13-05 (Apr. 11, 2014).

The following summary focuses mainly on the circumstances pertinent to this case.

A. The Federal Affordable Care Act and Anthem's Filings With the Bureau.

Effective January 1, 2014, the federal Patient Protection and Affordable Care Act, P.L. 111-148 ("ACA"), established a nationwide framework for health insurance plans to be offered in each state through a market or "exchange" established either by the state or, in Maine and the other states that elect not to establish their own exchanges, by operation of the ACA. 12/20 Tr. 171:3-172:14; *see also* 12/11/13 Tr. 58:1-59:9.[3] In anticipation of the 2014 rollout date, Anthem began to design health insurance plans and the provider networks for those plans to be offered in the ACA exchange for Maine. 12/20 Tr. 172:18-173:15-21.

Anthem designed one set of health plans, called the Guided Access POS point of service plans, to be offered in Maine's northern and eastern counties, and another set of plans, called the Guided Access HMO health maintenance organization plans, for Maine's southern and western counties. *Id.* The latter set of plans cover the area served by the health care facilities operated by Petitioner CMHC and the individual health care providers affiliated with those facilities. *See* 12/11 Tr. 76:5-16.

The provider network that Anthem proposed for the Guided Access POS plans for northern and eastern Maine is an open or broad network, meaning that the network is open to any health care facilities and providers in the area covered by the plans who enter into provider contracts with Anthem. However, the provider network that Anthem designed for the Guided

---

[3] This and similar references are to the transcripts of the December 11 and December 20 evidentiary hearings, with page and line citations as indicated.

Access HMO plans to be offered in southern and western Maine is a "narrow network",

meaning a network that includes some health care providers and facilities in the area covered

by the plans, and excludes the rest. *Id.* Anthem's goal in designing the Guided Access HMO

narrow network was to enable Anthem to negotiate discounts from the in-network providers

and thereby offer coverage at lower premium rates to consumers. *See* 12/11 Tr. 76:5-16.

As a health insurer doing business in Maine, Anthem is regulated by the Maine Bureau

of Insurance. By law, every managed care health insurance plan, such as Anthem's Guided

Access plans, must provide its insureds with "reasonable access to health care services" offered

by health care providers, and insurers offering such plans must obtain Bureau approval of their

access plans. *See* 24-A M.R.S. § 4303(1). Accordingly, Anthem was required to obtain the

Bureau's approval of Anthem's access plans, including the proposed provider networks, for

members of its Guided Access HMO and POS plans. *See* 12/11 Tr. 60: 7-18.

In April 2013,[4] Anthem submitted the following documents to the Bureau, and asked

that all be treated as confidential:

- a PowerPoint reflecting Anthem's analysis of, and strategy surrounding the ACA, the
  narrow network, and its plans for new products the "April PowerPoint"

- materials reflecting Anthem's strategy to migrate existing policyholders into ACA-
  compliant plans

- a letter from its president providing a high-level overview of Anthem's proposed
  narrow network

Bureau Hearing Exhibit 1, 04/1/2/13 Anthem Letter to the Bureau; Bureau Hearing
Exhibit 2, 05/02/13 Anthem Letter to the Bureau; *see also* Bureau's Indices of Records,
Indices A and B.

On May 31, Anthem submitted its request for approval of the Guided Access HMO

narrow network. 12/11 Tr. 76:5-16. Anthem's filing included directories of the providers in

---

[4] Unless otherwise provided, all dates referred to in this Order are for 2013.

4

Anthem's narrow network as well as member geographic distribution data. Anthem was required to file examples of the contracts it entered into with the in-network providers. *Id.* at 164:16-24. In compliance with this requirement, Anthem provided examples of hospital contracts and its contracts with doctors and ancillary providers participating in the narrow network the "Provider Contracts". *Id.* Anthem requested that the Bureau treat the entire filing as confidential, and in fact asked that the existence of the filing be kept confidential.

On June 5, the Bureau received correspondence from the Center for Consumer Information and Insurance Oversight "CCIO", the entity charged with reviewing and approving health plans for Qualified Health Plan "QHP" status. *Id.* at 68:17-25; *see also* 70:12-20; Bureau Hearing Exhibit 3 (CCIO email message to Bureau). Federal QHP status is a prerequisite for a health insurance plan to be offered on the ACA exchanges. Initial Record ("R.") 4-8. In its correspondence, CCIO requested the Bureau's cooperation in maintaining QHP filings as confidential "to protect the sensitive nature of this information." Bureau Hearing Exhibit 3 (CCIO email message to the Bureau).

On June 5, the Bureau issued a notice of pending proceeding and hearing, the purpose of which was to determine whether Anthem's proposed narrow network could provide reasonable access to healthcare services. The proceeding was docketed as INS-13-801 ("BOI Docket 801"). R. 35-37.

On June 5, the Bureau issued a notice of pending proceeding and hearing, the purpose of which was to determine whether the narrow network could provide reasonable access to healthcare services. *See* R. 35-37.

B. CMHC's FOAA Requests

Meanwhile, on May 23, the Bureau received a FOAA request from CMHC ("CMHC's FOAA Request"). 12/11 Tr. 66:4-5. CMHC's FOAA Request sought six categories of

documents. R 1-2. Requests No. 1 and 2 sought the attachments to two letters Anthem sent to the Bureau, dated April 12 and May 2, which the Bureau had previously provided to CMHC, without the attachments, in response to an earlier inquiry.[5] R. 1; 12/11 Tr. 62:1-8. Request No. 3 sought documents relating to the provider networks Anthem intended to propose for its new products. R. 1. Request No. 4 sought "[a]ll records in the possession of the Bureau relating to Anthem's application for certification of a Qualified Health Plan since April 1, 2013." R. 1. Requests No. 5 and 6 sought historical information relating to past HMO products offered by Anthem. R. 1.

CMHC's FOAA request ranked in the "top ten percent or so" most complex and difficult FOAA requests the Bureau had received over the years. 12/11 Tr. 65:1-66:5. On May 24, Thomas Record, the Bureau's Senior Staff Attorney and Public Access Officer, began the process of gathering documents responsive to CMHC's FOAA Request. Id. at 37:9-10, 38:2-8, 73:13-14. Mr. Record identified eight Bureau staff members who might possess responsive documents and followed up to obtain what they had. Id. at 73:5-12.

Documents relating to Anthem's QHP application proved particularly difficult to retrieve. The application included a series of electronic databases containing information about the proposed products, which was filed with state and federal regulators. 12/11 Tr. 67:3-68:9. They were stored on a recently redesigned electronic filing system called SERFF, in a format that was "radically different" from the format for product filings the Bureau was familiar with. Id. at 66:23-68:9, 73:23-25.

---

[5] CMHC through its counsel had inquired of the Bureau on May 3 as to whether Anthem had made any filings regarding its proposed narrow network, but the Bureau did not treat the inquiry as a FOAA request, see 12/11 Tr. 205:7-8, and in any event, the Bureau's response was not appealed and has not been challenged in this appeal.

It took Mr. Record approximately 15 to 20 hours of work to identify nearly 3,000 pages of records responsive to CMHC's FOAA Request. *Id.* at 216:11, 188:6-20. In addition to Mr. Record, other Bureau staff spent time responding to the Request at a time when Mr. Record testified the Bureau was "quite busy" as a result of ACA implementation and "various other matters." *Id.* at 188:6-187:23.

Although it was still compiling and reviewing documents responsive to CMHC's request, the Bureau responded to CMHC's FOAA Request on May 31, five working days after receiving the Request. *See* R.3; 12/11 Tr. 74:7-15, 75:2-6. The response indicated that the Bureau was withholding certain responsive documents pending its confidentiality determination; would follow its established protocol for making the confidentiality determinations; and expected to provide a complete response the following week. 12/11 Tr. 74:7-15, 75:2-6.

On June 6, CMHC's counsel made an oral request for access to Anthem's May 31 filing. 12/11 Tr. 9-10.

C. The Bureau's Protocol for Designated Confidential Material

Though most of the material filed with the Bureau falls within the definition of the FOAA definition of "public record," *see* 1 M.R.S. § 402(3), the regulated entities that make filings with the Bureau frequently assert, as did Anthem in the case of its access plan filings, that their filings include trade secret or other confidential commercial information. *See* 12/11 Tr. 42:20-43:2.

The Maine FOAA exempts from the definition of "public record," and hence from disclosure under FOAA, any material that would be protected from discovery under the Maine Rules of Civil Procedure, including what Rule 26 defines to be "trade secret or other confidential research, development, or commercial information." *See* 1 M.R.S. § 402(3)(B)

7

(definition of "public records" excludes material privileged under rules of court); M.R. Civ. P. 26(c)(7) (protective order against discovery).

Thus, when the Bureau receives a FOAA request for documents in the Bureau's possession or custody that the filer of the documents has identified as trade secret or similar confidential information, the Bureau has to assess the validity of the filer's confidentiality claim in order to determine whether to disclose the requested documents to the FOAA requester. *See* 12/11 Tr. 51:15-52:12. What can make that task difficult is that the Bureau often lacks firsthand knowledge of the facts necessary to evaluate whether a document does in fact contain trade secrets or similarly privileged information as claimed. *Id.* Another complicating factor is that information that qualifies as a trade secret when first filed with the Bureau may not retain that status when the Bureau receives a FOAA request for the information weeks, months, or years after the filing. *Id.* at 55:14-22.

As FOAA requests seeking asserted trade secret or confidential information became more common during the 1990s, the Bureau developed a systematic procedure or protocol for determining whether information filed with the Bureau should be disclosed or withheld from disclosure in response to FOAA requests. *Id.* at 47:20-48:1. At all times relevant to CMHC's FOAA request, that protocol [hereinafter "the Protocol"] has been reflected in a Bureau policy document titled "Instructions for Requesting Confidential Treatment of Documents Filed with the Bureau of Insurance." R.66. The policy document is currently posted on the Bureau's website at http://www.maine.gov/pfr/insurance/company/confidential_treatment.htm

The Protocol has been in use, with minor modifications, since the late 1990s. 12/11 Tr. 48:5-11. The Protocol requests any entity that is asserting a document it is filing with the Bureau to be confidential and protected from disclosure to: (a) provide a statement "specifically identifying the parts of the documents for which confidentiality is being asserted" and (b)

8

"describe the specific basis under the law upon which the assertion is being made." R. 66. The Protocol provides, "Should the Bureau disagree with an assertion of confidentiality, you will be so notified and given an opportunity to request a hearing on the issue." R. 66, 67.

The Protocol provides further:

Should a third party seek access to a document that is subject to your assertion of confidentiality, you will be provided an opportunity to present argument in support of the validity of your assertion as of that time. The requesting party will also be provided an opportunity to present argument in support of the requested access. The Bureau will review the arguments and make a determination as to whether or not it believes the document is available to the third party. Should that determination be adverse to you, you will be provided an opportunity to seek judicial relief before the document is released.

R. 66, 67.

The Protocol does not establish deadlines for either the filer's initial assertion of confidentiality or the procedure by which the filer and the FOAA requester can advocate against and for the disclosure of the document. *See* R. 66–68.

The Bureau's rationale for the adversary process defined in the Protocol is that it gives the Bureau a better basis on which to decide whether to disclose the documents at issue to the FOAA requester, and thus serves to strike the balance between public access to government records and protecting confidential information reflected in the FOAA itself. 12/11 Tr. 49:11–16, 50:7–11; 56:3–9.

The Protocol provision also affords the party asserting confidentiality an opportunity to seek judicial relief before the Bureau discloses the record, in recognition that a disclosure is irrevocable once made. *Id.* at 52:10–12; 12/20 Tr. 92:13–22.

The Protocol was not intended to be judicially enforceable and the Bureau has never sought to enforce it judicially. 12/11 Tr. 56:22–57:6. Though the Bureau customarily follows the Protocol, it does not view itself as obligated to do so in every case. *Id.* at 56:10-16. In particular, the Bureau may depart from the Protocol if it can make a determination without

9

briefing by the parties, and in fact it did so in the course of responding to CMHC's FOAA request. *Id.* at 57:3-5; Bureau Hearing Exhibit 5 (e-mail chain between Anthem and the Bureau rejecting certain Anthem trade-secret claims without briefing); R. 7 (accepting certain Anthem confidentiality claims without briefing).

D. Events Leading Up to the Bureau's June 21, 2013 Response to CMHC's FOAA Request.

On Monday, June 3, the Bureau became aware of Anthem's Friday, May 31 filing for approval of its access plans, in the form of provider networks, for the Guided Access HMO and POS plans. 12/11 Tr. 75:17-76:1. On June 6, CMHC orally requested copies of these filings from the Bureau. *Id.* at 9:4-10:20. That same day, the Bureau denied Anthem's requests for confidential treatment of the existence of the filings; the cover letter for the filings; and two revised cover letters. Bureau Hearing Exhibit 5 (e-mail chain between Anthem and the Bureau). The Bureau did not give Anthem an opportunity to request an adjudicatory hearing or seek judicial relief before disclosing the existence of the applications to CMHC on June 6, and gave Anthem one day, until June 7, to seek judicial relief before providing the cover letters to CMHC. *Id.*; 12/11 Tr. 78:19-23, 81:20-23.

The Bureau further responded to CMHC's FOAA Request on June 6 by enclosing documents the Bureau determined were public records under FOAA; enumerating the remaining documents for which the Bureau desired briefing by the parties; and providing a briefing schedule requiring Anthem to file a brief within four working days and giving CMHC up to seven days after Anthem's brief to file a response. R.4-8.

The Bureau elected to set a briefing schedule that was "somewhat expedited" in response to a perception that CMHC's attorney was "obviously anxious for the documents." R. 1-2; 12/11 Tr. 89:21-90:6. Accordingly, the Bureau provided each party approximately one

10

week to respond, when the Bureau might typically "allow a couple of weeks." 12/11 Tr. 89:11-18.

Anthem provided further argument in support of its confidential designations to the Bureau on June 12. R.11-19; *see also* 12/20 Tr. 177:17-178:13. Given the passage of time, some of the documents, including the network applications themselves, were no longer confidential. *Id.* Accordingly, Anthem withdrew its request for confidential treatment of the network applications and the map reflecting the hospitals that were to be included in the narrow network. *Id.* The Bureau accordingly produced these documents to CMHC on or before June 13. 12/11 Tr. 233:2-11, 234:20-236:8. Anthem designated the remaining documents as either confidential until approved or confidential even after approval. R.11-19; *see also* 12/20 Tr. 177:17-178:13. Anthem provided additional argument in support of its requested confidentiality designation for each category of documents. *See* R.11-19.

On June 18, the Bureau Superintendent granted a motion from the Attorney General to make public Anthem's provider network list, including the lists of physicians who would be participating providers in Anthem's narrow network. 12/11 Tr. 252:3-254:6, 258:4-17. The next day, seven days after Anthem's response, CMHC filed its response to Anthem's confidentiality brief. R. 20-23.

E. The Bureau's June 21, 2013 Response to CMHC's FOAA Request.

On June 21, two days after CMHC's reply, the Bureau issued a written FOAA response ("the June 21 FOAA response") to CMHC's request, assigning potentially responsive documents to one of four categories: documents that already had been made public; documents that were public records to be disclosed under FOAA; documents that were deemed confidential while Anthem's application was pending, to be withheld from FOAA disclosure until the filing to which they applied was approved, and documents deemed confidential and not

11

public records subject to FOAA disclosure. R. 24-30. The Bureau stayed the release of the documents it intended to disclose to CMHC for two days to give Anthem the opportunity to seek judicial review. R. 24.

In its June 21 FOAA response, the Bureau determined the following documents were public records to be disclosed: Anthem's Managed Care Accessibility Analyses; ACA Subsidy Estimates; and portions of Anthem's QHP application. R. 25-30. The Bureau also determined that the portion of Anthem's QHP application relating to small-group rates would become public on July 1, the deadline for Anthem's competitors in the small-group market who were not seeking QHP status to file their rates. R. 28; 12/11 Tr. 171:7-172:3; Bureau Hearing Exhibit 15 (Timeline for Non-Grandfathered Small Group Health Plan Filings).

The Bureau's June 21 FOAA response determined that two categories of documents— provider contracting documents and the April PowerPoint—contained trade secret information for purposes of the FOAA exception. R. 25, 29.

Regarding the provider contract documents, the Bureau explained:

> These exhibits contain information regarding the terms of Anthem's contracts with providers in the proposed network. Anthem has asserted a valid claim of trade secret privilege for these documents. CMHC has not contested the highly sensitive nature of this information. Even in rate review proceedings, which are subject to particularly strong transparency requirements, provider contracting information is expressly protected from disclosure. *See* 24-A M.R.S. § 2736(2).

R. 25.

Concerning the April PowerPoint, the Bureau determined that it "sets forth business plans of Anthem and…falls within the scope of the trade secret privilege under M.R. Evid. 507." R.29 (internal footnote omitted). The Bureau considered redacting some of the April PowerPoint, but determined that redaction of the PowerPoint could not be accomplished in any meaningful way. 12/11 Tr. 180:2-181:6; 12/20 Tr. 85:20-86:23.

12

F. Subsequent Bureau Responses

On June 26, the Bureau issued another letter noting that its June 21 FOAA response had not addressed the status of four draft product discontinuance and replacement letters. R. 31. The Bureau determined these documents were public records, giving Anthem until the next day, June 27, to seek judicial relief. *Id.* On July 2, the Bureau provided a letter regarding additional disclosures including certain updated QHP information. R. 32.

As of August 28, 2013, following the Bureau's approval of Anthem's individual and small group forms, the Bureau continued to withhold ten documents from CMHC, totaling 76 pages. R. 33-34; Bureau's Indices of Records, Index B. The ten documents are listed in the Bureau's Indices of Records, Index B and are Bates labeled FOAA 1-76.

## II. *Analysis*

As noted above, CMHC advances three essential contentions in the context of a FOAA appeal and a request for declaratory relief. The first contention focuses on the Bureau's Protocol; the second focuses on documents that the Bureau continues to withhold in response to CMHC's FOAA request, and the third asserts that CMHC is entitled to an award of attorney fees and litigation costs based on the Bureau's alleged bad faith.

### 1. CMHC'S CHALLENGE TO THE BUREAU'S PROTOCOL

CMHC's challenge to the Protocol arises under both FOAA and the Maine Declaratory Judgments Act,14 M.R.S. §§ 5951 *et seq.* CMHC seeks a declaratory judgment that the Protocol on its face is invalid because it is contrary to FOAA's requirements, and also because it is a rule that should have been, but has not been, subjected to the rulemaking requirements of the Maine Administrative Procedure Act. CMHC also argues that the Bureau's "assertion of its Protocol" in responding to CMHC's FOAA request caused unreasonable delay in the release

13

of public records, and has led the Bureau to withhold public records in continuing violation of the FOAA. *See* Amended Complaint at 7.

CMHC's challenge to the validity of the Bureau's Protocol on the ground that the Protocol is a rule that is invalid because it has not been subjected to the rulemaking process required by the Maine Administrative Procedure Act seems purely a declaratory judgment issue. However, CMHC's contention that the Protocol violates FOAA, on its face and as applied to CMHC"s FOAA request, might be deemed to raise both declaratory judgment and FOAA appeal issues.

The burden of proof in declaratory judgment actions is usually determined by reference to the "substantive gravamen of the complaint." *Hodgdon v. Campbell*, 411 A.2d 667, 671-72 (Me. 1980). The party asserting the affirmative of the controlling issues in the case, whether or not the nominal plaintiff, usually bears the risk of persuasion. *Id.* Here, the substantive gravamen of CMHC's declaratory judgment claim is that the Protocol is contrary to, and hence in violation of, FOAA. CMHC alleges a claim of illegal government action, such as might be raised in a Rule 80B appeal. *See Town of Minot v. Starbird*, 2012 ME 25, ¶ 11, 39 A.3d 897; *Zegel v. Board of Social Worker Licensure*, 2004 ME 31, ¶ 14, 843 A.2d 18. Thus, it seems logical to place the burden of proof on CMHC with respect to its claim that the Protocol is invalid.

On the other hand, in the context of CMHC's FOAA appeal, it is the Bureau's burden to demonstrate its denial of a FOAA request was just and proper. *Dow v. Caribou Chamber of Commerce and Indus.*, 2005 ME 113, ¶ 9, 884 A.2d 667. In that sense, it seems logical that the Bureau should bear the burden to justify its response to CMHC's FOAA request, including the Bureau's use of the Protocol in doing so. The court reviews *de novo* whether the Bureau

14

complied with FOAA in responding to CMHC's FOAA Request. *See Springfield Term. Ry. Co. v. Dep't of Transp.*, 2000 ME 126, ¶ 8, 754 A.2d 353, 356.

The analysis turns to CMHC's facial challenge to the Protocol.

A. The Validity of the Bureau's FOAA Protocol On Its Face

CMHC facial challenge to the Protocol rests on four grounds: the Protocol is a rule that has not undergone rulemaking required by the Maine Administrative Procedure Act; the Protocol violates FOAA's reasonable time standard; the Protocol violates FOAA by improperly presuming documents to be confidential until proven public; and the Protocol violates FOAA by favoring confidentiality over disclosure.

*i. Whether the Protocol Is A Rule that Should Have been Subjected to Rulemaking*

CMHC argues that the Protocol was improperly developed without proper rulemaking or statutory authority. CMHC Memorandum of Law at 9. The Maine Administrative Procedure Act ("APA") requires administrative agency rules to be adopted through a procedure to which the Bureau's Protocol has admittedly not been subjected. *See* 5 M.R.S. § 8052.

The Bureau counters that the Protocol is not a rule for purposes of the Maine APA, and only explains the Bureau's procedure for dealing with filings alleged to include confidential material, and for responding to FOAA requests for such material. Bureau Memorandum of Law at 18-20. The Bureau also asserts that nothing in the FOAA precludes an administrative agency from developing and publishing guidance of the kind reflected in the Protocol.

The Maine APA defines the term "rule" as the "whole or any part of every regulation, standard, code, statement of policy, or other agency guideline or statement of general applicability…that is or is intended to be judicially enforceable and implements, interprets or makes specific the law administered by the agency, or describes the procedures or practices of the agency." 5 M.R.S.A. §8002(9)(A).

The APA excludes from the definition of "rule" "[a]ny form, instruction or explanatory statement of policy that in itself is not judicially enforceable, and that is intended solely as advice to assist persons in determining, exercising or complying with their legal rights, duties or privileges." 5 M.R.S.A. § 8002(9)(B)(4). An agency policy is not judicially enforceable if the agency "would never have occasion to ask a court to order anyone to comply with it." *Roderick v. State*, 2013 ME 34, ¶ 11, 79 A.3d 368.

Consistent with its full title, "Instructions for Requesting Confidential Treatment of Documents Filed with the Bureau of Insurance," the Protocol contains instructions to filers about how they should assert confidentiality claims over documents they submit to the Bureau and the process by which the Bureau will determine whether to honor those claims. R. 66-67. The Protocol also contains a brief overview of FOAA intended to "guide" filers "in preparing a request for confidentiality letter." R. 66, 67-68. Mr. Record, a co-author of the Protocol, testified that the Protocol was not intended to be, and, to his knowledge has never been, judicially enforced in its fifteen years of existence. 12/11 Tr. 56:22-57:6.

On its face, the Protocol does not mandate or prohibit action by either the filer of records or the FOAA requester of records, but simply permits filers to request confidentiality and, in the event of a FOAA request, to argue against disclosure, and permits FOAA requesters to argue in favor of disclosure. The failure of a filer to request confidential treatment, or the failure of a filer or requester to advocate for or against disclosure, does not trigger any sanction; it means only that the Bureau acts on a FOAA request for the records in question without the input from filers and requesters that the Protocol allows. Bureau Memorandum of Law at 19. There is no plausible scenario under which the Bureau would or could seek judicial enforcement of the Protocol by asking a court to order a filer or requester to comply with it.

16

Because the Protocol is not—and was not intended to be—judicially enforceable and functions solely to provide guidance to filers and FOAA requesters about how to protect, or seek disclosure, of allegedly confidential documents filed with the Bureau, the Protocol is not a "rule" for purposes of the Maine APA rulemaking procedure. *See Roderick, supra,* 2013 ME 34 at ¶ 11, 79 A.3d 368. While FOAA does not direct agencies to develop and explain such policies for responding to FOAA requests, nothing in the statute prohibits agencies from doing so. In enabling the proponent of confidential treatment and the proponent of disclosure to make their cases, the Protocol arguably provides the Bureau with a more current and accurate basis for resolving issues of confidentiality than would be the case without the Protocol.

    ii.     *Whether The Protocol Violates FOAA's "Reasonable Time" Standard.*

CMHC argues that the briefing process in the Protocol violates FOAA by leading to unreasonable delays in responding to FOAA requests. CMHC Memorandum of Law at 10; CMHC Reply Memorandum of Law at 1. The Bureau, on the other hand, argues that the Protocol's briefing process is flexible and thus appropriate in light of the flexible nature of FOAA's reasonable time standard and the fact-specific nature of trade secret determinations. Bureau Memorandum of Law at 21-25.

The term "public records" is broadly defined to include a wide variety of documents in the possession or custody of an agency in connection with, or related to, the transaction of public or governmental business. 1 M.R.S.A. § 402(3). However, public records do not include records that have been designated confidential by statute or that are "within the scope of a privilege against discovery" or an evidentiary privilege protecting disclosure in civil or criminal trials. 1 M.R.S.A. § 402(3)(A) & (B).

Section 408-A of FOAA provides "a person has the right to inspect and copy any public record in accordance with this section *within a reasonable time of making the request* to inspect or

17

copy the public record." 1 M.R.S.A. § 408-A (emphasis added). Although FOAA leaves what

is a reasonable time for being granted access to records to a case-by-case determination,

subsections of section 408-A shed light on the Legislature's intentions:

- section 408-A(3) gives the agency to which a FOAA request is made up to five working days to acknowledge receipt of the request, and allows the agency, within that time, to ask for clarification of the request.[6]
- section 408-A(3) provides that, [w]ithin a reasonable time of receiving the request, the agency or official shall provide a good faith, nonbinding estimate of the time within which the agency or official will comply with the request, as well as a cost estimate . . ." 1 M.R.S.A. § 408-A(3).

- section 408-A does not set any specific deadline for the agency or official to search for, retrieve and compile the requested public record, and specifically provides that "[c]ompiling the public record includes reviewing and redacting confidential information." 1 M.R.S.A. § 408-A(8)(B).

Whether a public agency has acted on a FOAA request within a reasonable time is a

function of several variables: how many records are requested; how easy or difficult it is for the

public agency to access and review the records; whether the requested records contain

confidential information or need to be analyzed for other reasons in order for the public agency

to decide whether they qualify as "public records," whether partial disclosure, i.e., redaction, is

appropriate, and what regular activities beyond responding to the FOAA request are occupying

---

[6] In arguing that the Protocol violates FOAA by delaying access to public records, CMHC seems to suggest that a public agency's failure to complete its response to a FOAA request within five working days violates FOAA. CMHC Memorandum of Law at 8-9. The FOAA provision in question reads: "If a[n]...agency...having custody or control of any public record refuses permission to inspect or copy or abstract a public record, the body or agency or official shall provide written notice of the denial, stating the reason for the denial, within 5 working days of the request for inspection or copying. *Failure to comply with this subsection is considered failure to allow inspection or copying and is subject to appeal as provided in section 409.* "1 M.R.S.A § 408-A(4) (emphasis added).

Given that subsection 3 of Section 408-A gives an agency five working days just to acknowledge a FOAA request, it makes little sense that subsection 4 would make it a FOAA violation for an agency to fail to grant access to the requested records within the same time. Also, CMHC's interpretation ignores the fact that FOAA requires a response within a reasonable time. A more logical interpretation of the five-day deadline in Section 408-A(4) is that it trigger the requester's opportunity to appeal. *See Tenants Harbor General Store, LLC v. Dep't of Envt'l Protection*, 2011 ME 6, ¶ 9, 10 A.3d 722 (courts "take into account the structure of the statute and the placement of the statute in context to generate a harmonious result").

the resources of the public agency. *See* 1 M.R.S. § 408-A(5) (access to public records "may be scheduled at a time that will not delay or inconvenience the regular activities of the agency"). The determination of whether a requested record contains a trade secret can take time and delay a decision on disclosure, because it is a fact-specific determination in which numerous, non-dispositive factors are considered and balanced. *See Bernier v. Merrill Air Engineers*, 2001 ME 17, ¶ 26, n.6, 770 A2d 97.

The unspoken premise of CMHC's objection to the briefing process permitted by the Protocol is that the Bureau should act on a FOAA request without the delay associated with obtaining input from the filer and the requester. Such a policy could lead to bad FOAA decisions. Denying a FOAA request based solely on the Bureau's initial determination that a record was confidential as of when it was filed ignores the possibility that the record is no longer confidential. Conversely, disclosing a record that the Bureau determined to be confidential at the time it was filed, without affording the filer some opportunity to object, has equally obvious, albeit different, flaws. In that sense, the Protocol, far from violating FOAA, actually may promote better decision making in response to FOAA requests.

The briefing procedure allowed by the Protocol is optional and flexible. Nothing in FOAA precludes the process defined in the Protocol.

### iii. Whether The Protocol Presumes Confidential Status Without Regard to the Validity of the Designation.

CMHC argues the Protocol on its face violates FOAA because it presumes a document is confidential, based "upon *any* request for confidentiality regardless of its validity," and calls for withholding the document until it is proven public. CMHC Reply Memorandum of Law at 1 (emphasis in original); *see also* CMHC Memorandum of Law at 10;

This argument lacks merit. The Protocol does not presume that documents alleged by the filer to be confidential are in fact confidential. As discussed above, upon the filer's initial

19

request for confidentiality, the Protocol permits the Bureau to reject the request. R. 66, 67 ("Should the Bureau disagree with an assertion of confidentiality, you will be notified and given an opportunity to request a hearing on the issue"). Following the briefing process, the Bureau again assesses the filer's confidentiality claim. *Id.* ("The Bureau will review the arguments and make a determination as to whether or not it believes the document is available to the third party"). Nothing in the Protocol reflects a presumption of confidentiality.

iv. *Whether The Protocol Violates FOAA By Creating a Balancing Test Weighted In Favor of Confidentiality*

CMHC argues that the Protocol inappropriately treats the FOAA analysis as a balancing test weighted in favor of confidentiality. CMHC Memorandum of Law at 10-11. In particular, CMHC claims the Protocol improperly considers the consequences of disclosing confidential documents, while not considering "the irrevocable consequences of non-disclosure," consequences that "FOAA"s reasonable time considerations and heavy favoring of the disclosure of documents" are meant to prevent. CMHC Memorandum of Law at 10-11.

FOAA's general rule that exceptions to FOAA should be strictly construed does not create a presumption that records are public. *See MaineToday Media, Inc. v. State,* 2013 ME 100, ¶ 9, 82 A.3d 104. Although the exemptions from the definition of "public records" are to be narrowly construed, agencies are just as bound to withhold confidential records as they are to disclose public records. In addressing FOAA issues, the courts, too, must be "cognizant of the need to balance transparency of government action with the protection of sensitive information". *Anastos v. Town of Brunswick,* 2011 ME 41, ¶ 9, 15 A.3d 1279.

The Protocol on its face creates a procedure under which the Bureau can obtain up to date and accurate information that will enable it to make an up to date and accurate determination of whether a given document is a public record or not. Contrary to CMHC's

20

contention, the Protocol does not presuppose any particular outcome, nor does it favor non-disclosure over disclosure.

For all of the foregoing reasons, the court concludes that the Protocol reflects a valid Bureau policy for determining whether assertedly confidential records should be disclosed in response to a FOAA request. The court therefore will declare in its judgment that the Protocol does not violate FOAA.

B.  The Bureau's Application of the Protocol In Responding to CMHC's FOAA Request

This section evaluates CMHC's argument that the Bureau's application of the Protocol in responding to CMHC's May 23 FOAA request caused the Bureau to violate FOAA in the following respects:

- withholding certain documents in the Bureau's possession until at least June 6, without making any confidentiality determination;

- adopting a universal approach presuming virtually every record was confidential;

- treating the FOAA analysis as a balancing test weighted in favor of confidentiality;

- favoring Anthem by providing it time to seek judicial review when its documents were determined to be public record; and

- failing to redact any documents.

*See* CMHC Memorandum of Law at 8-12; CMHC Reply Memorandum of Law at 1-2.

The following analysis of CMHC's contentions assumes that the Bureau has the burden to demonstrate that it responded to CMHC's FOAA request consistent with FOAA, both in terms of the timing of the response and in terms of the Bureau's determination to grant or withhold disclosure. The Law Court has held that a public agency has the burden to justify denial of a FOAA request for access to public records, *see Springfield Term. Ry. Co. v. Dep't of Transp.*, 2000 ME 126, ¶ 9, 754 A.2d 353, 356. A delay in access to public records is simply a

21

time-limited denial of access, and this court sees no reason to shift the burden away from the agency when access is denied for a time and then granted.

The facts support the Bureau's characterization of CMHC's May 23 FOAA request as a particularly difficult request. 12/11 Tr. 65:1-66:5. The Bureau's Public Access Officer, Mr. Record, spent 15 to 20 hours working to identify nearly 3,000 pages of records responsive to the request at a time when the Bureau was "quite busy" due in part to implementation of the ACA. 12/11 Tr. 188:6-20, 216:11. The Bureau had difficulty retrieving documents relating to Anthem's QHP application due to technical issues. *Id.* at 66:23-68:9, 73:23-25. Nevertheless, while still gathering documents, the Bureau responded to CMHC five working days after receiving CMHC's FOAA Request, explaining that the Bureau would be withholding certain responsive documents pending a confidentiality determination. R.3; 12/11 Tr. 74:7-15, 75:2-6.

On Monday, June 3, the Bureau became aware of Anthem's applications for approval of their Guided Access HMO and POS networks. 12/11 Tr. 75:17-76:1. On June 6, the Bureau denied Anthem's request for confidential treatment of the existence of the filings and the filings' cover letters. Bureau Hearing Exhibit 5 (e-mail chain between Anthem and the Bureau). The Bureau disclosed the existence of the applications on June 6 and provided the cover letters to CMHC the following day, after giving Anthem a day to seek judicial relief. *Id.*; 12/11 Tr. 78:19-23, 81:20-23.

On June 6, ten working days after receiving CMHC's FOAA Request, the Bureau provided a further response. R. 4-8. The response enclosed documents the Bureau determined were public records, enumerated records for which it requested briefing by the parties to determine the confidentiality of, and provided an expedited briefing schedule. R. 4-8; 12/11 Tr. 75:17-76:1, 89:11-90:06. When Anthem advised in its June 12 brief that it was withdrawing its confidentiality claims as to certain records, the Bureau produced those records to CMHC by the

22

next day. 12/11 Tr. 233:2-11, 234:20-236:8. On June 18, in response to a motion by the Attorney General, the Bureau disclosed additional documents to CMHC. *Id.* at 252:3-254:6, 258:4-17. On June 21, two days after CMHC filed its response to Anthem's confidentiality brief, the Bureau issued its determination of which records were public. R. 26-40. The June 21 FOAA response explained the Bureau's confidentiality determination and noted that it would make the documents it determined were public record available on June 25, subject to Anthem's right to seek judicial relief. R.24-30.

In light of the fact-specific nature of Anthem's trade-secret assertions, the size and complexity of the May 23 Request, the Bureau's other duties implementing the ACA, and the technical difficulties they encountered, the Bureau has met its burden to show that its responses to CMHC's FOAA Request complied with FOAA's reasonable time standard. It follows necessarily that nothing in the Bureau's application of the Protocol in responding to CMHC's request caused unreasonable delay for purposes of a FOAA violation.

CMHC appears to argue that the Bureau violated FOAA's reasonable time standard by withholding documents as confidential, without any determination as to confidentiality, when the Bureau "knew where they were and that CMHC wanted them." CMHC Memorandum of Law at 8. In particular, CMHC sought attachments to the April 12 and May 2, 2013 letters from Anthem to the Bureau. 12/11 Tr. 217:9-22. Those documents were withheld until June 6, 2013. *Id.* There is, however, no FOAA requirement that an agency must respond in a piecemeal manner to FOAA requests. The Bureau's decision to collect all the responsive documents and then release what it could on the same day was consistent with FOAA's recognition that compliance with FOAA should not "delay or inconvenience the regular activities of the agency." 1 M.R.S. § 408-A(5). In this case, the Bureau's regular activity

23

included making a decision on Anthem's request for approval of its network access plans by the federal deadline.

CMHC also appears to argue the Bureau's response to the May 23 FOAA request was flawed because the Bureau presumed virtually every requested record to be confidential, instead of applying the particularized approach required by FOAA. CMHC Memorandum of Law at 9-10, *quoting MaineToday Media, Inc.*, 2013 ME 100, ¶ 30, 82 A.3d 104.

Just as the Protocol on its face does not adopt any presumption of confidentiality, so there is no evidence the Bureau adopted such a presumption in responding to CMHC's May 23 FOAA request. Furthermore, the briefing process and June 21 FOAA response, along with the Bureau's June 6 Letter to CMHC, indicate the Bureau *did* carry out a particularized approach. *See* R. 4-8, 24-30 (determining confidentiality based on individual documents and categories of related documents).

CMHC further asserts the Bureau erred by considering the "irrevocable consequences of disclosure," without considering the "irrevocable consequences of non-disclosure," i.e. hindering CMHC's ability to meaningfully participate in BOI Docket 801, the proceeding in which the Bureau considered Anthem's application for approval of its network access plans. CMHC Memorandum of Law at 10. The implicit premise in CMHC's argument-- a FOAA requester's need for access to the requested records should dictate the timing of the agency's response—is dubious. Moreover, CMHC has not shown that it could not have intervened and participated in the Bureau proceeding.

Furthermore, the facts do not support CMHC's argument that the Bureau placed an improper emphasis on the irrevocable consequence of disclosure. While the Bureau does point out the "irrevocable consequence of disclosure" it also worked to establish an expedited briefing schedule in response to its perception that CMHC sought to obtain the documents promptly.

24

12/11 Tr. 89:11–90:6. Accordingly, the court finds the Bureau did not violate FOAA by applying a balancing test improperly favoring confidentiality.

CMHC also objects to the Bureau's decision to provide Anthem time to seek judicial review and suggests that in doing so, the Bureau improperly put Anthem's confidentiality interests ahead of its FOAA obligations. CMHC Memorandum of Law at 11. This assertion is groundless.

First, there is no evidence that the Bureau considered the harm of disclosure in deciding what documents were public records. Instead, that consideration figured only in the Bureau's decision to afford Anthem an opportunity to seek judicial review. 12/11 Tr. 52:10–12; 12/20 Tr. 92:13–22. FOAA permits a public agency to afford such an opportunity. *See Maine Health Care Association Workers' Compensation Fund v. Superintendent of Insurance*, 2009 ME 5, ¶¶ 6–7, 962 A.2d 968 (recognizing that absent an opportunity to seek judicial review, the "substantial rights" of the alleged trade secret owner would be "irreparably lost" through disclosure). Second, the abbreviated opportunity—typically one or two days—that the Bureau provided Anthem to seek judicial relief can hardly be said to constitute an unreasonable delay.

Finally, CMHC argues the Bureau's decision not to produce any redacted documents is further evidence the Bureau violated FOAA by assuming documents were confidential and broadly interpreting the exceptions to FOAA. CMHC Memorandum of Law at 11-12. In particular, CMHC claims, "in all of the nearly 3,000 pages of documents that the Bureau...withheld, or continues to withhold...not a single document was redacted." *Id.* at 11.

In fact, many of the nearly 3,000 pages were provided to CMHC as public record. *See* R. 25-30. In addition, a substantial portion of the remaining documents were form-related parts of Anthem's QHP, which were categorically protected by statute while the Bureau's form review was pending. *See* R. 27; 24-A M.R.S. § 24128. This left only 10 documents, comprising 76

25

pages, that the Bureau could have redacted. *See* Bureau's Indices of Records, Index B. The record indicates that the Bureau considered redacting some of the April PowerPoint, but determined that redaction of the PowerPoint could not be accomplished in any meaningful way. 12/11 Tr. 180:2-181:6; 12/20 Tr. 85:20-86:23. The Bureau also considered redacting the provider contracts and related documents, but decided it should not try to parse which elements of the documents were trade secrets and which could be disclosed to the public, especially in light of the Bureau's mandate to treat provider contracting information as confidential. 12/20 Tr. 73:1-17.

Accordingly, the Bureau has shown that its decision not to redact documents did not rest on any presumption in favor of confidentiality or on an overbroad interpretation of the exceptions to FOAA.

Based on the foregoing analysis, the court concludes:

- the Bureau Protocol is a valid statement of the Bureau's policy for determining whether to disclose records that a filer has designated as confidential in response to a FOAA request

- the Bureau's application of the Protocol to CMHC"s FOAA request did not violate FOAA

## 2. THE RECORDS THAT THE BUREAU CONTINUES TO WITHHOLD

This section addresses CMHC's FOAA appeal regarding documents that the Bureau continues to withhold. The withheld material consists of 76 pages Bates numbered FOAA 01-76, contained in what is identified in the record as Index B.

FOAA requires that public records be available to the public. *See Town of Burlington v. Hosp. Admin. Dist. No. 1*, 2001 ME 59 ¶ 13, 769 A.2d 857 citing 1 M.R.S. § 408. To further this objective, "FOAA must be liberally construed." *Dow v. Caribou Chamber of Commerce and Indus.*, 2005 ME 113, ¶ 9, 884 A.2d 667 *citing* 1 M.R.S. § 401; *Town of Burlington*, 2001 ME 59, ¶ 13,

26

769 A.2d 857. The Bureau bears the burden to establish just and proper cause for withholding documents in response to a FOAA request. *Id.* at ¶ 9.

As discussed above, FOAA exempts from disclosure, among others, "[r]ecords that have been designated confidential by statute;" and "[r]ecords that would be within the scope of a privilege against discovery or use as evidence recognized by the courts of this State in civil or criminal trials if the records or inspection thereof were sought in the course of a court proceeding..." 1 M.R.S. § 402(3)(A) & (B). This includes trade secrets as well as "other confidential research, development, or commercial information." M.R. Evid. 507; M.R. Civ. P. 26(c)(7).

### A. Confidentiality of Provider Contracts and Related Documents Generally

The Bureau's June 21 FOAA response found that the provider contracts and related information submitted by Anthem:

> contain information regarding the terms of Anthem's contracts with providers in the proposed network. Anthem has asserted a valid claim of trade secret privilege for these documents. CMHC has not contested the highly sensitive nature of this information. Even in rate review proceedings, which are subject to particularly strong transparency requirements, provider contracting information is expressly protected from disclosure. *See* 24-A M.R.S. § 2736(2).

R. 25. Anthem maintains that these documents are confidential pursuant to statute, as trade secrets, and as confidential commercial information. Anthem Memorandum of Law at 22-33. The Bureau also asserts the documents are trade secrets, while CMHC maintains the documents are public record. Bureau Memorandum of Law at 33-37; CMHC Memorandum of Law at 12-15.

CMHC argues that "[a] significant portion of the Bureau's basis for withholding the documents was that they were analogous to provider contracts in rate filings in 24-A M.R.S. § 2736(2)." CMHC Memorandum of Law at 12. Section 2736(2) exempts from designation as

public record, the amount and terms of reimbursement in a contract between an insurer and a third party in individual rate filings by health insurers. 24-A M.R.S.A. §2736(2).

Pointing to a discrepancy in terminology between the statutory language of section 2736(2) and the Bureau's recitation of that language in the Protocol,[7] CMHC argues that the Bureau misinterpreted the statute to hold that all aspects of provider contracts are confidential, when the statute only requires the terms and conditions of reimbursement be excepted from public records. CMHC Memorandum of Law at 13-14. CMHC's argument misinterprets the Bureau's June 21 FOAA response. The Bureau's response clearly referred to section 2736(2) to highlight the sensitive nature of provider contracting information even in rate cases, *not* as a basis for the Bureau's decision. R. 25 ("Even in rate review proceedings, which are subject to particularly strong transparency requirements, provider contracting information is expressly protected from disclosure").

Anthem, on the other hand, also argues that the Maine Insurance Code, read as a whole, "embodies a broad recognition of the presumptive confidentiality of provider contracts that...provides an independent ground for affirmance" of the Bureau's ruling. Anthem Memorandum of Law at 26.

Anthem points to 24-A M.R.S.A. § 4303(17)(C) in particular, as evidence that an insurer's contracts with providers are exempt from disclosure under FOAA. Section 4303(17)(C) addresses an insurer's ability to seek a waiver of a most favored nations clause in a provider contract as follows:

> C. Prior to the issuance of the superintendent's findings and decision on an application for a waiver pursuant to this subsection, any contract, proposal or draft legal instrument submitted to the superintendent in an application for a waiver is not a public record for

---

[7] 24-A M.R.S. § 2736(2) provides, in pertinent part that "the amount and terms or conditions <u>or</u> reimbursement in a contract between an insurer and a 3rd party" need not be public records, while the Protocol states that "the amount and terms <u>of</u> reimbursement in a contract between an insurer and a third party" need not be public records. R. 68.

28

the purposes of Title 1, chapter 13, except that the name and business address of the parties to an application for a waiver are public information. After the issuance of the superintendent's findings and decision, the superintendent may disclose any information that the superintendent determines is not proprietary information. For the purposes of this paragraph, "proprietary information" means information that is a trade secret or production, commercial or financial information the disclosure of which would impair the competitive position of the carrier or provider submitting the information and would make available information not otherwise publicly available.

24-A M.R.S.A. § 4303(17)(C).

On its face, section 4303(17)(C) exempts provider contracts filed with the Bureau from disclosure under FOAA until after the decision on the insurer's waiver request, at which point any such contract to the extent it is determined to be not "proprietary" may be disclosed. Thus, the import of section 4303(17)(C) here is not to establish confidential status *per se* for Anthem's provider contracts, but to bolster Anthem's argument that they are confidential.

The Bureau and Anthem argue that the provider contracting documents are protected from disclosure as trade secrets. Bureau Memorandum of Law at 37; Anthem Memorandum of Law at 29-32. The Maine Legislature has defined trade secret information as information derives "independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use," and is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 10 M.R.S.A. § 1542(4). *See also Bernier, supra,* 2001 ME 17, ¶ 25, 770 A.2d 97.

Factors relevant to whether the information derives independent economic value from not being generally known or readily ascertainable include: (1) the value of the information to the filer and to its competitors; (2) the amount of effort or money the filer expended in developing the information; (3) the extent of measures the filer took to guard the secrecy of the information; (4) the ease or difficulty with which others could properly acquire or duplicate the information; and (5) the degree to which third parties have placed the information in the public

domain or rendered the information "readily ascertainable" through patent applications or unrestricted product marketing. *Bernier*, 2001 ME 17, ¶ 26, n.6, 770 A2d 97 n.6.

Anthem argues that the provider contracts are negotiated on a confidential basis and that these negotiations may last upwards of a year before a final agreement is achieved. 12/20 Tr. 161:14-162:22. In addition, Anthem explains that each provider contract is unique because all of the terms and conditions—including duration, rates, language, and methods of reimbursement—are negotiable. *Id.*

Anthem argues that disclosure of its provider contracts would harm Anthem as a competitor, in that Anthem would lose negotiating leverage with providers who could point to favorable terms in other provider contracts; Anthem's competitors could use publicly available contracts as templates for their own provider negotiations without expending the time and effort Anthem put into developing the contracts; and Anthem's competitors could use the pricing information in the provider contracts during their own negotiations to drive down their reimbursements without expending the resources Anthem put into developing and negotiating the contracts. *Id.* at 164:14-165:20, 167:5-168:21. Anthem spends approximately $1.5 billion annually in provider reimbursements in Maine and views provider contracts as the "core" of its business. 12/20 Tr. 169:10-170:9.

Anthem also argues that it takes considerable efforts to keep the provider contracts confidential. In particular, the contracts are negotiated solely by a small group within Anthem. *Id.* at 166:4-24. The resulting contracts are then maintained in separate files within that group on a need to know basis and stored electronically on a separate drive that is encrypted and password protected. *Id.*

CMHC counters that the Bureau did not make an effort to distinguish between confidential pricing information and other non-confidential terms and conditions. CMHC

Memorandum of Law at 14. CMHC also argues that Anthem did not take reasonable efforts to maintain the secrecy of Exhibits 4-6 and 8 because they were sent to every potential provider of Anthem's narrow network, some of whom did not ultimately end up joining. *Id.* In addition, CMHC argues that Anthem failed to support its claim to have taken steps to preserve the confidentiality of its provider contracts. *Id.*

Anthem responds, and the court agrees, that sending these documents to Anthem's contracting partners did not destroy their status as trade secrets and that its actions were reasonable under the circumstances of attempting to recruit hundreds of providers for its narrow network. Anthem Memorandum of Law at 32 n. 9.[8] A provider contract that is exempt from disclosure under FOAA does not become a "public record" for FOAA purposes just because many providers have signed it.

---

[8] Anthem also bases its argument on cases decided under the federal Freedom of Information Act "FOIA". Anthem Memorandum of Law at 32 quoting *Blethen Maine Newspapers, Inc. v. State of Maine*, 2005 ME 56, ¶ 13, 871 A.2d 523. Exemption 4 to the federal FOIA provides that the Act's directive to make records available to the public does not apply to, among others, "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552b4 2000. In particular, Anthem cites to *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, which determined that under Exemption 4 to FOIA, information voluntarily provided to an agency is deemed confidential "if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc). However, numerous courts have declined to follow *Critical Mass's* interpretation that information voluntarily submitted to the government is confidential if the agency customarily holds such information in confidence. *See New York Public Interest Research Group v. U.S. E.P.A.*, 249 F.Supp. 2d 327, 335 S.D.N.Y. 2003 declining to follow *Critical Mass* because it "would result in too liberal a test for confidentiality..."; *Dow Jones Co., Inc. v. F.E.R.C.*, 219 F.R.D. 167, 177 C.D. Cal. 2003 declining to adopt the *Critical Mass* confidential information test; *Int'l Broth. of Elec. Workers Local 68 v. Denver Metro. Major League Baseball Stadium*, 880 P.2d 160, 167 Colo. App. 1994 declining to follow *Critical Mass* and concluding that it is insufficient under the Colorado Open Records Act to merely classify information as confidential for it to warrant that designation. While cases under FOIA can inform the court's analysis of FOAA, they are not determinative. Here, FOIA Exemption 4 is parallel to, but textually distinct from 1 M.R.S.A. § 402(3)(B). In particular, 1 M.R.S.A. § 402(3)(B), unlike Exemption 4 to FOIA, does not expressly exempt confidential commercial information from the definition of FOAA. Compare 1 M.R.S.A. § 402(3)(B) with 5 U.S.C. § 552b4. Instead, it exempts records that are within the scope of a privilege against discovery or an evidentiary privilege. 1 M.R.S.A. § 402(3)(B). In this case, the privilege against discovery Anthem seeks to invoke requires a showing that the party requesting a protective order demonstrates good cause why it needs the order to guard against annoyance, embarrassment oppression, or undue burden or expense. M.R.Civ. P. 26(c)(7). This privilege is narrower than FOIA Exemption 4. Accordingly, in order to withhold confidential commercial information, Anthem must make the showing required under M.R. Civ. P. 26(c)(7).

31

With that overview, the analysis turns to the ten documents that continue to be withheld by the Bureau for the court's *de novo* determination of whether they are exempt from disclosure under FOAA. Because review is *de novo*, the court does not defer to the agency's determination. Also, review takes account of present circumstances, meaning that information that may have been confidential when the Bureau first obtained may be no longer confidential because it has been made public through other means.

B. *Exhibits 1, 2, 3 and 7 Are Exempt from Disclosure Under FOAA*

Exhibits 3 (FOAA 7-38) and 7 (FOAA 47-62) are fully executed provider contracts between Anthem and specific providers. The court agrees with Anthem and the Bureau that these contracts provide Anthem substantial independent economic value, based on their being confidential and not available to the public. Anthem expended significant time and effort drafting these documents and Anthem's competitors could gain an economic advantage by using the contracts as templates for their own negotiations without expending the same time and effort as Anthem. Furthermore, Exhibit 3 contains specific reimbursement rates that, if publicly available, could assist competitors in their own negotiations with providers and could also assist providers in their negotiations with Anthem. Although Exhibit 7 does not contain specific reimbursement rates, it still contains numerous terms and provisions—including the duration of the contract and methods of reimbursement—that could provide a great deal of value to Anthem's competitors, contracting partners, or potential contracting partners. The record further demonstrates that Anthem took numerous precautions to keep Exhibits 3 and 7 secret. *See* 12/20 Tr. 166:4-24. Accordingly, the Bureau had just and proper cause to find Exhibits 3 and 7 are trade secrets exempted from the definition of public records.

These facts also support a finding that Anthem demonstrated good cause that public disclosure of Exhibits 3 and 7 would constitute an undue burden or expense for Anthem. In

32

particular, the release of Exhibits 3 and 7 could cause Anthem undue burden and expense in future negotiations by offering providers a benchmark from which to commence negotiations or by providing competitors templates for their own negotiations without expending the same time and effort as Anthem.

The court has considered whether disclosure of redacted versions of Exhibits 3 and 7 is appropriate and decides against it for the following reasons. To "slice and dice" the substantive provisions of provider contracts in terms of disclosing some provisions and not others ignores the reality, established in Anthem's evidence, that the provider contract should be considered as an integrated whole that has value, in its entirety, as a trade secret or confidential commercial asset. The alternative would be to redact the document so substantially as to make the record unintelligible, and such a course serves no valid FOAA purpose.

Exhibit 1 (FOAA 1-2) and Exhibit 2 (FOAA 3-6) contain amendments to provider contracts between Anthem and specific health care facilities. Exhibit 1 contains reimbursement rates, terms relating to the provider's operation under the narrow network, and provisions discussing the duration of the contract. FOAA 1-2. Exhibit 2 is similar except that it does not specify reimbursement rates. While these provisions do not reflect the same investment of time and effort as Exhibits 3 and 7, they reflect strategic business decisions which have a great deal of value for Anthem, as well as its competitors, contracting partners, and potential contracting partners. Exhibits 1 and 2 also received the same substantial precautions to safeguard its secrecy as Exhibits 3 and 7. *See* 12/20 Tr. 166:4-24.

Based on the evidence that provider contracts are integrated agreements that, taken as a whole, merit protection as confidential records, amendments to such contracts deserve the same

33

protection. Redaction of Exhibits 1 and 2 is not feasible, for the same reasons as redaction of Exhibits 3 and 67 is not feasible.

C. *The Cover Letters in Exhibits 4, 5, and 6 Are Not Exempt from Disclosure Under FOAA, and the Attachments Are Exempt*

Exhibits 4 (FOAA 39-40), 5 (FOAA 41-42), and 6 (FOAA 43-46) are form letters to providers regarding participation in Anthem's narrow network, with attached contract amendments. The cover letters to Exhibits 4 through 6 do not contain any information reflecting independent economic value. Instead, they contain straightforward language informing the hypothetical provider that it has been selected to join Anthem's narrow network and that an amendment to their former agreement is enclosed. *Id.* Accordingly, the court determines that the cover letters in Exhibits 4 through 6, FOAA 39, 41 and 43 do not qualify as trade secrets or warrant protection as confidential commercial information under M.R. Civ. P. 26(c)(7) and must be disclosed to CMHC. The attached amendments are confidential for the reasons given with respect to Exhibits 1, 2 3 and 7.

D. *Exhibit 8 Is an Amendment to a Provider Contract and is Exempt from Disclosure*

Exhibit 8 (FOAA 63-64) is a form letter to providers describing the terms of the proposed narrow network, but it also constitutes an amendment to the provider contract that is confidential for the reasons given with respect to Exhibits 1, 2, 3 and 7 and the attachments to Exhibits 4, 5 and 56.

5. *Exhibit 9 is Not Exempt from Disclosure Under FOAA*

Exhibit 9 (FOAA 65-66) is an e-mail thread discussing the process for a particular provider to apply for inclusion in Anthem's narrow network. Exhibit 9 simply relates to a provider being sent information about how to apply for inclusion in Anthem's narrow network. None of the competitive harms that Anthem legitimately cites will ensue if this email exchange becomes known to the world. Accordingly, Exhibit 9 does not qualify as a trade secret or

34

warrant protection as confidential commercial information under M.R. Civ. P. 26(c)(7) and must be disclosed to CMHC.

E. *Exhibit 10 Is Exempt From Disclosure Under FOAA*

Exhibit 10 (FOAA 67-76) is Anthem's April PowerPoint presentation. Anthem contends that it reflects the internal strategic analysis of Anthem's management team concerning the ACA and Anthem's plans for productions and networks. 12/20 Tr. 180:10-181:1. The PowerPoint includes an analysis of how Anthem's premium rates would change in 2014 under different assumptions. FOAA 74-76; 12/20 Tr. 180:10-181:1. Anthem explains that the PowerPoint contains independent economic value because it provides "a roadmap that somebody could [use] to get started offering products in Maine." 12/20 Tr. 181:10-182:11. Anthem further argues that it took reasonable steps to maintain the secrecy of the PowerPoint because, aside from its submission to the Bureau, it was only disclosed to members of Anthem's upper management. *Id.* at 181:10-182:11. CMHC counters that the Bureau made no effort to redact the April PowerPoint and drew no distinction between documents voluntarily submitted and those compelled by the agency. CMHC Memorandum of Law at 15.

The court's independent review of the April PowerPoint indicates that it warrants trade secret protection in its entirety. The April PowerPoint contains valuable information to both Anthem and its competitors regarding Anthem's business strategy. The April PowerPoint also can only be taken to reflect a considerable investment of time, resources and analysis by Anthem. This information cannot be readily duplicated as it reflects business strategy and conclusions of Anthem upper management. Finally, Anthem took appropriate measures to keep the PowerPoint secret through its limited disclosures. 12/20 Tr. 181:10-182:11.

These facts also support a finding that Anthem demonstrated good cause that public disclosure of Exhibit 10 would constitute an undue burden or expense for Anthem under M.R.

35

Civ. P. 26(c)(7). In particular, the release of Exhibit 10 could cause Anthem undue burden and expense by providing competitors potentially valuable insights into Anthem's business strategy and making it easier for competitors to enter the market and offer plans in competition with Anthem's.

Lastly, the court sees no defensible means of distinguishing the confidential components from those that lack inherent confidential commercial value, so does not view redaction as a feasible option.

### 3. WHETHER THE BUREAU ACTED IN BAD FAITH FOR PURPOSES OF FOAA

FOAA provides for an award of reasonable attorney fees and litigation expenses to the requesting party when the responding agency is determined to have acted in bad faith in refusing the request for records. *See id.* § 409(4). During the hearing, after CMHC had presented its direct case, the court ruled that CMHC had not demonstrated any bad faith on the part of the Bureau. Given the court's ruling that some of the ten documents that the Bureau continues to withhold are in fact "public records" for purposes of FOAA, the court *sua sponte* re-examines that issue.

The court assumes that CMHC has the burden to demonstrate bad faith on the part of the Bureau. Based on the entire record, the court cannot say that CMHC has met that burden. Based on the entire record, including the court's determination of the ten withheld documents, CMHC has not shown that the Bureau acted in bad faith in responding to CMHC's request. The fact that the court, after a *de novo* trial, disagrees with the Bureau's assessment of the confidentiality of five of the 76 pages of withheld documents does not change that conclusion.

### *III. Conclusion*

It is hereby ORDERED, DECLARED AND ADJUDGED as follows:

36

1. As to Count I of the Amended Complaint, Petitioner's appeal under FOAA, 1 M.R.S. § 409, is hereby sustained in part as set forth below and is otherwise denied.

2. As to Count II of the Amended Complaint, Petitioner's prayer for a declaratory judgment regarding the validity and application of the Respondent Maine Bureau of Insurance's policy as stated in "Instructions for Requesting Confidential Treatment of Documents Filed with the Bureau of Insurance" is hereby granted. The court hereby declares "Instructions for Requesting Confidential Treatment of Documents Filed with the Bureau of Insurance" to be a valid and lawful statement of policy. The court further declares that the Respondent's application of that statement of policy in responding to Petitioner's FOAA request to be lawful and valid, and not in conflict with the FOAA.

3. The exhibits listed in Index B (FOAA 1-76) constitute trade secrets and confidential commercial information and are therefore not public records for purposes of FOAA, *see* 1 M.R.S. § 402(3)(B), M.R. Civ. P. 26(c)(7), except for the first pages of Exhibits 4, 5 and 6 and Exhibit 9 (FOAA 39, 41, 43, 65-066), which are public records under FOAA.

4. The Bureau shall disclose to CMHC the first pages of Exhibits 4, 5 and 6 and Exhibit 9 (FOAA 39, 41, 43, 65-66) the day after the expiration of the deadline for the Bureau and/or Anthem to take an appeal or cross-appeal from this Decision and Judgment. Should either the Bureau or Anthem file a timely appeal or cross-appeal, disclosure shall be stayed pending appeal.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Decision and Judgment by reference in the docket.

Dated: July 29, 2014

A.M. Horton
Justice, Business & Consumer Court

37

**Central Maine HealthCare Corporation v. Maine Bureau of Insurance**
**BCD-AP-13-03**


**Central Maine HealthCare Corporation**
    **Petitioner / Plaintiff**

    Counsel:               Michael R. Poulin, Esq.
                             Adam R. Lee, Esq.
                             95 Main St
                             Auburn, ME 04210


**Maine Bureau of Insurance**
    **Respondents / Defendants**

    Counsel:               Jonathan Bolton, AAG.
                             Thomas Sturtevant, Jr., AAG.
                             6 State House Station
                             Augusta, ME 04333


**Anthem Health Plans of Maine, Inc.**
    **Intervenors**

    Counsel:               Christopher Roach, Esq
                             Clifford Ruphrecht, Esq.
                             66 Pearl Street, Suite 200
                             Portland, ME 04101